[No. 29263. *En Banc.* January 4, 1945.]

THE STATE OF WASHINGTON, *Appellant,* v. SYDNEY BRUNN, *Respondent.*[1]

[1]Reported in 154 P. (2d) 826.

*Lloyd Shorett, John F. Evich, Wm. R. Bell,* and *Evans D. Manolides,* for appellant.

*Henry Clay Agnew,* for respondent.

ROBINSON, J.—The information in this action contained two counts, the first, charging the defendant with the crime of receiving stolen whiskey above the value of twenty-five dollars, knowing that the same had been stolen; the second, with the crime of receiving and concealing certain personal property over the value of twenty-five dollars, with knowledge of the fact that the same had been stolen. The cause was dismissed, by order of the trial court, at the close of the state's case. The state has appealed from the formal order subsequently entered. It does so in reliance upon Rem. Rev. Stat., § 2183-1 [P. C. § 7290-1], of which the portion material here reads as follows:

"The state may have a right of appeal to the supreme court, upon giving the same notice as is required of other parties, when the error complained of is based on the following: . . . (5) Any order which in effect abates or determines the action, or discontinues the same, otherwise than by an acquittal of the defendant by a jury: Provided, That in no case shall the state have a right to an appeal where the defendant has been acquitted by a jury. [L. '25, Ex. Ses., p. 423, § 7.]"

The sole relief sought by the appellant is that this court order a new trial of the action. The respondent contends that such an order would constitute a peremptory mandate to the trial court to violate an unalienable right guaranteed

to him in Art. I, § 9, of the state constitution, which reads as follows:

"No person shall be compelled in any criminal case to give evidence against himself, *or be twice put in jeopardy for the same offense.*" (Italics ours.)

It is respondent's position that he has been in jeopardy, and that a new trial would place him twice in jeopardy, in violation of the foregoing provision. He accordingly moves to dismiss the appeal, contending that he cannot lawfully be tried again, and, since a new trial is the sole relief sought by the state's appeal, it would be idle and fruitless to consider it on the merits. The question thus presented is: Was the respondent once in jeopardy, within the meaning of Art. I, § 9, of the state constitution?

In approaching the question, it will be necessary to consider the terms of the order appealed from and the circumstances which led to its entry. The formal order was signed by the trial judge on December 30, 1943. Endorsements show that it was presented by Mr. Evich, the deputy prosecuting attorney who represented the state and, presumably, drafted the order. It also bears an endorsement: "OK as to form, H. C. Agnew, Atty. for Deft." It reads as follows:

"This matter having come on for hearing this 30th day of December, 1943, upon the motion of the defendant for the issuance of an order in the above entitled court for the dismissal of the above entitled action upon the ground and for the reason that the evidence produced by the plaintiff, State of Washington, was insufficient and the Court having examined all the evidence and having listened to the arguments of counsel and it appearing to the Court that the plaintiff, State of Washington, did not produce sufficient evidence to prove that the liquor offered in evidence but refused by the Court, was stolen property and that the defendant·knew the same to have been stolen and the Court believing that the evidence was insufficient to prove the crime charged, now, therefore,

"It is Hereby Ordered, Adjudged and Decreed that the defendant's challenge to the sufficiency of the evidence be and the same is hereby sustained, and the above entitled cause is dismissed."

It is said, however, on page 28 of the state's brief, that the court discharged the jury, although no motion challenging the sufficiency of the evidence had been formally made by respondent. At another point in the brief, it is said that such a motion was "interposed inferentially." An examination of the statement of facts, prepared by the state and certified by the trial judge about six weeks after signing the order as containing all material facts, matters, and proceedings, and so forth, occurring at the trial, indicates that, in fact, no challenge to the evidence was made. It therein appears that the state, having presented all its oral testimony and being about to rest its case, offered in evidence some twenty cases of whiskey, and defendant's counsel, indicating that he wished to argue objections to their admission, suggested that the matter ought to be taken up in the absence of the jury. The jury was excused, and he began his argument. Among the grounds he suggested for the exclusion of the proffered exhibits was that there was no evidence to show that the defendant knew that they were stolen, and, while pursuing this line of argument, said:

"Of course that is more properly when it comes time for my argument on a directed verdict. But I still urge that as an additional ground as to all exhibits."

At this point, the court entered into a colloquy with the deputy prosecuting attorney as to whether or not there was such evidence, which was discontinued by a recess, after which the record notes: "Argument continued by both parties." This is followed by:

"THE COURT: Members of the Jury: The State has moved the admission of these various and sundry exhibits of whiskey or empty whiskey boxes, and has now rested its case.

"The defendant has challenged the sufficiency of the evidence, even though you believed all of it and all reasonable inferences that might arise from it, to convict the defendant of the charge that he bought stolen whiskey, knowing that it was stolen."

The trial judge then gave, at some length, his reasons for the action he was about to take, and concluded as follows:

"I have concluded that I have to sustain the challenge to the sufficiency of the evidence to warrant a conviction, however much we may feel that the defendant here is an undesirable person and that something should be done to him; yet you can not, under this evidence, find him guilty of having acquired or having after acquired sold stolen whiskey, knowing it to have been stolen."

It seems apparent that, because the long argument which took place on defendant's motion to exclude the cases of whiskey offered as exhibits was largely devoted to the insufficiency of the evidence to show that they had been stolen, the trial judge got the impression that a motion had been made by the defendant for dismissal for insufficiency of evidence to warrant a conviction. At any rate, the court dismissed the jury without waiting for the motion for a directed verdict which defendant's counsel had indicated that he would make in due course. It is further apparent that the reasons which the court gave for dismissing the action would have required him to direct a verdict for the defendant had one been made. We will recur to this matter later in the opinion.

Although the respondent has the affirmative on the question of law submitted for our decision, the state's contentions will be considered first.

There is a double jeopardy provision in the Federal constitution and in the constitutions of all of the states, except Connecticut, Maryland, Massachusetts, North Carolina, and Vermont, and even in those five states the right involved is enforced as a common-law right. In the Federal constitution and in the constitutions of more than thirty of the states, the wording of the provision is the same, or substantially the same, as in our own. It follows that there is a veritable wilderness of case authority. There are also many articles on the subject in legal periodicals, and, although they are, for the most part, devoted to criticism of the present state of the law, rather than the constitutional difficulty of finding a remedy, their footnotes are invaluable in locat-

ing the more important cases. Typical of such articles are the following: Former Jeopardy, 35 Yale L. J. 674; Appeals by the State in Criminal Cases, 36 Yale L. J. 486; Criminal Law and Procedure in New York, 26 Columbia L. Rev. 253; The Right of the State to Appeal in Criminal Cases, 3 Mo. L. Rev. 305; The Scope of Appeal in Criminal Cases, 84 Pa. L. Rev. 825; Appeal by the State in Criminal Cases, 15 Ore. L. Rev. 306. See, also, the discussion at the 1935 meeting of the American Law Institute reported in Volume 12 of its Proceedings, page 200.

Agitation by various legal reform bodies against certain phases of the double jeopardy rule, as applied in the courts, began many years ago. In its first stages, the movement was devoted to an attack on the rule applied by this court in *State v. Kinghorn,* 56 Wash. 131, 105 Pac. 234, 27 L. R. A. (N. S.) 136. In that case, the defendant was charged with rape. A jury was impaneled and sworn. The prosecuting witness was called to the stand, and the preliminary questions propounded, whereupon the defendant objected to the introduction of any further evidence and moved to dismiss the case, on the ground that he had not been arraigned and had not pleaded. The defendant was thereupon arraigned and pleaded not guilty. On the motion of the state, the jury was discharged and a new jury immediately impaneled and sworn to try the case, whereupon the defendant pleaded former jeopardy. The plea was denied, and the trial proceeded to a conviction. On appeal, this court held that he had been once in jeopardy, during the few moments he spent before the first jury, and for that reason the conviction was reversed and the defendant went forever free.

The rule applied was that laid down by Bishop in all nine editions of his work on Criminal Law, the first published in 1856, and the eighth, the last published under his direct supervision, in 1892. This work has had a striking influence upon the development of the American law of former jeopardy. Practically all the decisions on the subject handed down in both the Federal and state courts in the last sixty or seventy years cite it as authority, and often the sole authority, for the decision rendered. The rule cited

in the *Kinghorn* case, and immediately followed by quotations from Bishop, is as follows:

"There is a division of authority on the question as to when the period of jeopardy begins, but we think the better rule and the one supported by the decided weight of authority is that, when the accused has been placed upon trial in a court of competent jurisdiction on a sufficient indictment, before a jury legally impaneled and sworn, the constitutional peril has attached, and that a discharge of the jury without good cause and without the consent of the accused is equivalent to an acquittal."

It follows, of course, that, if Kinghorn had been charged with the vilest imaginable murder, and the state had at hand the most convincing evidence of his guilt, including his voluntary confession in writing, he would nevertheless have gone free under this rule, on the ground that he had once been in jeopardy, in that he was in peril and fear of conviction during the possibly two minutes consumed in asking a witness two or three questions. But, strangely enough, it is also the law that, if Kinghorn had been arraigned and pleaded before the jury was sworn, and the trial had proceeded without interruption for weeks or months, and the case had gone to the jury, and he had endured a long period of suspense while the jury was considering its verdict, and it had finally been dismissed for failure to reach an agreement, he would not have been once in jeopardy. *State v. Costello*, 29 Wash. 366, 69 Pac. 1099; *State v. Barnes*, 54 Wash. 493, 103 Pac. 792, 23 L. R. A. (N. S.) 932.

In an attempt to rationalize such decisions, one legal writer has said that, while the defendant in such a case may have been in fear and suspense during the trial and while the jury was considering his case, he was not, legally speaking, in jeopardy, but only mistakenly thought he was, which, considering the meaning of jeopardy, is equivalent to saying that he was not actually in fear and suspense, but only thought so.

That the defendant has not been once in jeopardy when the jury has been discharged for failure to agree, is now the

universal holding of the courts. But it has not been always so. The rule applied in the *Kinghorn* case, that a defendant was once in jeopardy if, after being sworn, the jury was discharged without his consent, was applied literally as late as 1888. A defendant convicted of murder in the first degree went free under this rule in *Hilands v. Commonwealth,* 111 Pa. 1, 2 Atl. 70, 56 Am. Rep. 235, and two years later another defendant charged with murder escaped trial because, at a former trial, the jury was, without his consent, discharged after having been out five days. *Commonwealth v. Fitzpatrick,* 121 Pa. 109, 15 Atl. 466, 6 Am. St. 757, 1 L. R. A. 451. It was held by this court, but little more than a year ago, that, when a jury was discharged without the personal presence of the defendant or his counsel in the courtroom at the time, the defendant had been once in jeopardy and could not be tried again. *State v. Ulmo,* 19 Wn. (2d) 663, 143 P. (2d) 862, 150 A. L. R. 759.

So many other so-called exceptions have been made to the rule applied in the *Kinghorn* case as to warrant suspicion as to its soundness. However, there can be no doubt that the decision in the *Kinghorn* case was in accordance with the overwhelming weight of authority at the time, and that the rule it applied is still supported by the numerical weight of authority. See citations to the text in 15 Am. Jur. 75, Criminal Law, §§ 406-425, and in chapter LXIII, 1 Bishop on Criminal Law (9th ed.), entitled "Second Prosecution for the Same Offence."

Without too much laboring the point, since we are not here directly concerned with the rule of the *Kinghorn* case, it may be said that there is much ground for believing that, at common law, it was not a rule of substance but of practice only, and one which varied from time to time and between court and court. See *United States v. Bigelow,* 3 Mackey's Reports (D. C.) 393, at 413 *et seq.*

There was a period in England when many of the judges apparently considered it their judicial duty to obtain convictions in all criminal cases which came before them for trial. To that end, if it appeared during trial that the jury was not likely to convict, it became the practice to discharge

that jury and impanel another, and, in some cases, a third or fourth, if necessary. The tyranny and injustice of such a procedure are obvious, but many times more apparent when it is remembered that in those days there were upwards of two hundred statutory crimes punishable with death, and a decision in the trial court was absolutely final. The defendant had no appeal. The rule that a jury could not be discharged without the defendant's consent grew up as a counterweight to that pernicious practice.

It was for the same reason, that is, to soften the harshness of the criminal law, that that highly technical body of rules concerning the construction and sufficiency of indictments came into being. That they were mere rules of practice, not suitable to present conditions, has always been recognized in this state. We quote from the early opinion of *State v. Wright,* 9 Wash. 96, 37 Pac. 313:

"The tender solicitude on the part of the government for the rights of citizens charged with crime is commendable; but the refinements and technicalities of the common law, which, under the circumstances and conditions of society two hundred years ago, were necessary for the protection of the citizen charged with crime, under the changing conditions of society are no longer necessary, and instead of insuring the proper results, more often tend to defeat the ends of justice and prevent the merited punishment of crime; and the blind adherence by the courts to these old and now useless rules of construction has largely, and not without reason, impressed the minds of the common people with the idea that the administration of criminal law is a farce."

Later, it was said, in *State v. Vane,* 105 Wash. 170, 174, 177 Pac. 728:

"It may be that the information would not meet the tests of the common law, but we have endeavored to relax the rigidity of those rules. When fair trials were the exception rather than the rule, it was but natural that judges, having a sense of right and humanity, should hold the state to strict pleading and to a stricter proof; but in these times, when those charged with crime are protected by every constitutional and statutory guaranty of a fair trial that a sense of humanity can suggest, and by a general sentiment that no innocent man shall be convicted of crime—when

education is general, and understanding of written words is common to all classes, there is no sound reason why the rigorous rule of the common law should be adhered to as a rule of construction in criminal pleadings."

Much that is said in the foregoing quotations is applicable to double jeopardy, as this court has applied that rule and must, on authority, continue to apply it unless the state is able to maintain the contention it makes on this appeal.

In 1904, the supreme court of the United States rendered a decision in *Kepner v. United States,* 195 U. S. 100, 49 L. Ed. 114, 24 S. Ct. 797, which sooner or later evoked most of the law review articles previously cited in this opinion, as well as many others. The limitations of space which will be necessarily invaded by this opinion render it impossible to state how the jeopardy question arose, but the majority adopted the following as its basis of decision:

"Mr. Bishop, in his work upon Criminal Law, sums up the scope and authority of such statutes as follows:

" 'A legislative provision for the rehearing of criminal causes cannot be interpreted—or, at least, it cannot have force—to violate the constitutional rule under consideration, whatever be the words in which the provision is expressed. When, therefore, a defendant has been once in jeopardy, the jeopardy cannot be repeated without his consent, whatever statute may exist on the subject. Such a statute will be interpreted with the Constitution, and be held to apply only to cases where it constitutionally may. *And if it undertakes to give to the State the right of appeal, to retry the party charged, after acquittal, it is invalid.* And so the writ of error, or the like, allowed to the State, can authorize the State to procure the reversal of erroneous proceedings and commence anew, only in those cases in which the first proceeding did not create legal jeopardy.' 1 Bishop Criminal Law (5th ed.), § 1026." (Italics ours.)

It is clear from the context that the word "acquittal" in the italicized sentence in the above quotation means acquittal either by a jury or by some ruling or direction of the trial judge. If this be sound law, the state's position in this case cannot be sustained; since, as will be later shown, this court has held, on several occasions, that the dismissal of a

criminal case on a challenge to the sufficiency of the evidence is equivalent to an acquittal, and in one of these, which is particularly applicable to the peculiar circumstances of the present case, that it is equivalent to a directed verdict. There was, however, a dissent in the *Kepner* case by Mr. Justice Holmes, in which two other justices joined, which has been accepted as the true rule by the majority of legal writers and by some of the courts. It is not often that so much weight is accorded to a mere dissenting opinion, but it dealt with a highly technical doctrine of the common law; and on matters concerning the history and development of that system of jurisprudence Judge Holmes has been acknowledged, both in England and in America, as a pre-eminent authority since his work entitled, "The Common Law," was published in 1881. His argument cannot be reproduced here, but we can quote, within limits, the substance of the proposition for which he contended:

"It seems to me that logically and rationally a man cannot be said to be more than once in jeopardy in the same cause, however often he may be tried. The jeopardy is one continuing jeopardy from its beginning to the end of the cause. Everybody agrees that the principle in its origin was a rule forbidding a trial in a new and independent case where a man already had been tried once. But there is no rule that a man may not be tried twice in the same case."

The reasoning of those who accept Mr. Justice Holmes' position as establishing that an appeal by the state may be provided by statute without infringing the almost universal constitutional provision against double jeopardy, may be summarized as follows: (1) The purpose of a criminal trial is to establish with finality the guilt or innocence of the defendant. (2) It is admitted that, when that has been done, the defendant has been once in jeopardy. (3) But it is not admitted that a verdict of a jury need necessarily be the end of a trial; for (4) it is within the legislative power to prescribe the method by which guilt or innocence shall be established with finality; and (5) the legislature may provide that the trial may be continued in a reviewing court in order to insure that the final determination of the defendant's guilt or innocence is free from legal error.

In the English practice under which the rule of double jeopardy developed, the verdict was final. No appeal was allowed to either party. Hence, it follows that we find the statement in hundreds of cases that, when one has been acquitted, he has been once in jeopardy. We find such statements, or statements equivalent thereto, in our own decisions. Two such cases may be mentioned: *State v. Hubbell*, 18 Wash. 482, 51 Pac. 1039, and *State v. Dye*, 81 Wash. 388, 142 Pac. 873. At first sight, it would seem that these decisions control the instant case, for both hold that the defendant was once in jeopardy when, as here, the state's case was dismissed on a challenge to the sufficiency of the evidence; but, when they were decided, the following statute was in effect:

"But an appeal shall not be allowed to the state in any criminal action, except when the error complained of is in setting aside the indictment or information, or in arresting the judgment on the ground that the facts stated in the indictment or information do not constitute a crime, or is some other material error in law not affecting the acquittal of a prisoner on the merits."

(This statute has never been expressly repealed, and is still carried in subsection 7, § 1716 [P. C. § 7290], of Remington's Revised Statutes. However, since the statute under which the appeal in the instant case is taken is a later and conflicting enactment, the statute above quoted must be considered repealed by implication.)

The motion to dismiss the appeal in the *Hubbell* case, *supra,* was on two grounds: First, that the statute above quoted affirmatively forbade the appeal; and second, on the ground urged in this case, namely, that the respondent, having been dismissed at the conclusion of the state's case on the challenge to the sufficiency of the evidence, had been once in jeopardy. In passing upon that ground, the court said:

"The acquittal was upon the merits of the case as determined by the court. Under such circumstances we think the defendant has been once in jeopardy."

In the *Dye* case, *supra,* the contention that a defendant, dismissed on a challenge to the sufficiency of the evidence, had been once in jeopardy, was again presented. The court said, in part:

"The state contends, however, that the defendant, having moved for a dismissal, consented to the judgment which was entered in the former proceeding. Many cases are cited to sustain the assertion that, where a defendant consents to an arrest of the trial, no jeopardy will attach. This is true and is well sustained by authority; but here there was not only a presentment, in a court of competent jurisdiction, before a jury, upon a sufficient information, but, after a full hearing of the state's case, a judgment on the merits was entered. Defendant did not consent to anything, but demanded and received the judgment of the law upon an admitted state of facts. While a proper practice would have been to take a directed verdict, in which event no question could have been raised, yet the legal effect of the motion is the same as if the proper one had been made. *State v. Hyde,* 22 Wash. 551, 563, 61 Pac. 719. . . .

"The prosecuting attorney contends that, the jury being charged to make deliverance by verdict, nothing less than a verdict can avail defendant. He says, if a jury is discharged without rendering a verdict, there is no jeopardy.

"We have already suggested that, under a practice such as prevails in this state permitting a judge to pass upon the legal sufficiency of the facts and to direct a verdict if there be no sufficient facts, a judgment on the merits is a bar."

Whether the instant case should be considered as having been actually dismissed on the challenge to the evidence, or, in view of the unusual circumstances detailed early in this opinion, as having in effect been dismissed on motion for directed verdict, it must be held, on the authority of the *Hubbell* and *Dye* cases, that the respondent here was legally acquitted; and, if the practice then in vogue be still in force, we will be required to dismiss this appeal. But the *Hubbell* and *Dye* cases have no direct bearing on the real question here presented, which is whether the legislative act providing additional trial procedure in an effort to insure that the arrival at a final determination of the guilt or innocence of defendants in criminal cases should be attained without legal error, is constitutional.

In support of its theory, the state has cited, among others, the following cases: *State v. Lee,* 65 Conn. 265, 30 Atl. 1110, 48 Am. St. 202, 27 L. R. A. 498; *State v. Felch,* 92 Vt. 477, 105 Atl. 23, and *State v. Witte,* 243 Wis. 423, 10 N. W. (2d) 117. The opinion in the *Lee* case is of such importance that examination of the whole thereof is required in order to appreciate its full significance. We feel constrained to quote, at some length, those portions which tend to justify and make clear the five propositions previously stated.

"*First:* 'That no one shall be put in jeopardy twice for the same offense, is a universal maxim thought worthy to be incorporated, to a certain extent, into the Constitution of the United States; and that an acquittal or conviction by a court having jurisdiction, on a sufficient indictment or information, is in all cases whatsoever a bar, is equally clear.' *State v. Benham,* 7 Conn., 418. This maxim is based upon a principle common to all systems of jurisprudence, *i. e.,* the finality of judicial proceedings. Broom's Legal Maxims, p. 312. If questions once tried and determined could be again agitated at the option of the parties, one main object of any administration of justice would be defeated. The function of courts is to settle controversies according to law. The object of settlement is secured by the principle of finality of judgments. *Finis finem litibus imponit.* The object of settlement in accordance with law the same in all cases, is secured by the correction of errors in the application of law in each case. Neither object is inconsistent with the other. The end is not reached, the cause is not finished, until both the facts and the law applicable to the facts, are finally determined. The principle of finality is essential; but not more essential than the principle of justice. A final settlement is not more vital than a right settlement. The adjustment of these principles in the establishment of procedure by means of which the final judgment shall not only settle the controversy but settle it in accordance with law, is determined in each jurisdiction by considerations of public policy and not by fundamental principles of jurisprudence. The principle *nemo bis vexare pro eadem causa,* gives protection against a second judicial proceeding, and in the event of such proceeding gives to a party the right, in criminal cases, to the plea of *autrefois acquit* or *autrefois convict,* and in civil cases to the plea of *res judicata;* but the principle does not control the question whether the judgment pleaded in bar is in fact a legal and

final judgment, and has no legitimate relation to the question whether existing procedure provides for correction of errors occurring in the trial. . . . After the verdict is returned, a re-trial is awarded only on further proceedings in the cause, which may or may not be authorized by the law regulating procedure. If such further proceedings are not authorized by law, the cause is ended, and the one jeopardy of the accused is exhausted; but this results *not* from any special sanctity attributable to a verdict tainted with illegality, but solely to the fact that the State, influenced by considerations of public policy, has decided to make such verdict, whether just or unjust, the end of that controversy. But when the State sees fit to provide that the cause shall not necessarily be so ended, but that further proceedings on motion of the accused may be had, an unjust verdict resumes its normal position of a legal nullity; and when the State provides for like proceedings on the motion of the prosecutor, a similar result must follow.

"The rule as formulated by this court in *State v. Garvey, supra* [42 Conn. 233], rests upon solid foundations: 'The principle which protects an individual from the jeopardy involved in a second trial for the same offense is well established and fully recognized. *The question however as to what constitutes a trial depends upon the course of procedure of the particular jurisdiction in which it is had,* and the construction of the courts there with respect to it.'" (Italics ours.)

In view of the fact that the state's citations as to the motion to dismiss were made in its reply brief, to which its adversary has had no opportunity to make answer, it is but fair to the respondent to note that the *Lee* case was adversely commented upon by the majority in *Kepner v. United States, supra,* and further, that there is no double jeopardy provision in the Connecticut constitution. However, the court treated the right to be free from double jeopardy as a common-law right, and, indeed, as "a principle common to all systems of jurisprudence." The Wisconsin court, however, in considering the *Witte* case, *supra,* was confronted with a constitutional provision, reading: "No person for the same offense shall be put twice in jeopardy of punishment." The court, following the theory hereinabove stated, held that this provision was not violated by a statute providing that the state might take a writ of error from rulings

and decisions adverse to the state upon all questions of law arising at the trial. This is an even broader statute than the statute purporting to authorize the appeal in the instant case. The Wisconsin court said, in part:

"This court realizes fully the importance of the protection of the liberty of its citizens, and the injustice of requiring a person to stand trial more than once for the same offense. The state should not be permitted to continually prosecute a citizen in the hope that it may find a jury which will eventually convict him, but it should have the privilege of one legal trial of the defendant for the offense with which he is charged. This can only be accomplished by the correction of material errors in each case, whether it be prejudicial to the state or to the defendant. The single jeopardy of the defendant is not terminated until both the facts and the law applicable thereto are finally determined. Finality is essential, but not when it is acquired contrary to law. Justice occupies the paramount position in American jurisprudence, and changes in procedure are fundamentally based on this fact. The statute in this case does not deprive defendant in error of a fair and impartial legal trial—in fact, it guarantees just this. There is a continuing jeopardy until the case is finally determined."

It is further said, in the same opinion:

"We recognize that somewhat similar statutes have been held to violate the constitutional provisions prohibiting double jeopardy. *People v. Webb,* 38 Cal. 467; *People v. Miner,* 144 Ill. 308, 33 N. E. 40, 19 L. R. A. 342; *Ex parte Bornee,* 76 W. Va. 360, 85 N. E. 529, and other cases."

Respondent cites these cases, and adds: *United States v. Ball,* 163 U. S. 662, 41 L. Ed. 300, 16 S. Ct. 1192; *Kepner v. United States,* 195 U. S. 100, 49 L. Ed. 114; *People v. Garcia,* 120 Cal. App. 767, 7 P. (2d) 401; *State v. Van Horton,* 26 Iowa 402; *State v. Anderson,* 3 Smedes & M. (11 Miss.) 751; *State v. Spear,* 6 Mo. 331; *State v. Peck,* 83 Mont. 327, 271 Pac. 707; *State v. Ostwalt,* 118 N. C. 1208, 24 S. E. 660, 32 L. R. A. 396; *Portland v. Erickson,* 39 Ore. 1, 62 Pac. 753; *Commonwealth v. Perrow,* 124 Va. 805, 97 S. E. 820.

We cannot undertake a detailed discussion of this list of cases. We may say, generally, that some of them are from intermediate courts, and, in our opinion, several are not

apposite. The opinion in the West Virginia case, *Ex parte Bornee, supra*, is the strongest of respondent's cited authorities, since it discusses the opinion in the *Lee* case and Mr. Justice Holmes' dissent in *Kepner v. United States*, and, for reasons therein given (although we think them insufficient), rejects both.

The doctrine of the *Lee* case, as well as the theory in the dissent of Justice Holmes, has evidently been given full faith and credit by the American Law Institute. Its investigation of the subject of double jeopardy was begun in 1930. A tentative draft on the subject was considered by its council in December, 1931, and, as amended by the council, was submitted, as a tentative draft, to its members at its annual meeting in 1932, and there discussed. After a three-year revisionary period, the proposed final draft was submitted to the 1935 meeting. See the discussion had at that meeting in American Law Institute Proceedings, Volume 12, p. 200. Articles concerning double jeopardy, then adopted, are included in the Institute's official draft of Administration of the Criminal Law, published in August, 1935, at page 13. In so far as directly pertinent to the present inquiry, they are as follows:

"§ 13. State may be granted a new trial—when. Where a person has been acquitted generally, and in the course of the trial a material error has been made to the prejudice of the State the State shall be entitled to a new trial.

"For commentary see page 111.

"§ 14. New trial not a subsequent prosecution. When on a prosecution a new trial is awarded, either on the application of the defendant or the State, such trial is not a subsequent prosecution of the defendant for the same offense for which the previous trial was had, but is a continuation of the original prosecution. . . .

"For commentary see page 116."

(The commentaries above referred to in the note after each section are comprehensive and of great value.)

The legislature which passed the act with which we are now concerned was most careful to avoid giving the state an appeal when the defendant had been acquitted by a jury,

so careful in fact that it included a redundant proviso. The state is given the right to appeal from:

"(5) Any order which in effect abates or determines the action, or discontinues the same, otherwise than by an acquittal of the defendant by a jury: *Provided,* That in no case shall the state have a right to an appeal where the defendant has been acquitted by a jury. [L. '25, Ex. Ses., p. 423, § 7.]"

At the time this act was passed, the state of our law was such that the most trivial mistake in practice, although in no way prejudicial, could, and sometimes did, result in clothing a guilty defendant with perpetual immunity from punishment. Of this legal enormity the *Kinghorn* case is a perfect illustration. It was also completely within the power of one man, the trial judge—and will still be if the statute we are discussing is held unconstitutional—to give complete and perpetual immunity to any criminal on trial before him by granting a challenge to the sufficiency of the evidence at the close of the state's case. *State v. Hubbell, supra; State v. Dye, supra.* We think that the wording of the act plainly indicates that its dominant purpose was to abolish the finality of *one-man* acquittals.

The *Kepner* decision was handed down in 1904. We now call attention to a later case in the same court, *Palko v. Connecticut,* 302 U. S. 319, 82 L. Ed. 288, 58 S. Ct. 149, decided in 1937. In the state of Connecticut, Palko had been held guilty of murder in the second degree and sentenced to life imprisonment. The state, not being satisfied with that result and having a statutory right of appeal, as we have seen in discussing the *Lee* case, took the matter to the state supreme court of errors. That court found that there had been error, to the prejudice of the state, in several particulars, and, among them, in giving an instruction as to the distinction between first and second degree murder, and remanded the case to the trial court for further proceedings. There, Palko pleaded that he had been once in jeopardy, in violation of the fourteenth amendment to the constitution of the United States. The plea was denied. He was convicted of first degree murder and sentenced to death, and

appealed to the supreme court of the United States. Although the Federal provision as to double jeopardy is in the fifth amendment, it was his contention that whatever was forbidden in the fifth amendment was made applicable to state procedure by the fourteenth. The court rejected that contention, and was, therefore, not required to define double jeopardy, but said of it:

"The subject was much considered in *Kepner v. United States*, 195 U. S. 100, decided in 1904 by a closely divided court. The view was there expressed for a majority of the court that the prohibition was not confined to jeopardy in a new and independent case. It forbade jeopardy in the same case if the new trial was at the instance of the government and not upon defendant's motion. Cf. *Trono v. United States*, 199 U. S. 521. *All this may be assumed for the purpose of the case at hand, though the dissenting opinions (195 U. S. 100, 134, 137) show how much was to be said in favor of a different ruling. Right-minded men, as we learn from those opinions, could reasonably, even if mistakenly, believe that a second trial was lawful in prosecutions subject to the Fifth Amendment, if it was all in the same case.* Even more plainly, right-minded men could reasonably believe that in espousing that conclusion they were not favoring a practice repugnant to the conscience of mankind. Is double jeopardy in such circumstances, if double jeopardy it must be called, a denial of due process forbidden to the states?" (Italics ours.)

In answering that question, the court said, in part:

"Is that kind of double jeopardy to which the statute has subjected him a hardship so acute and shocking that our polity will not endure it? Does it violate those 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions'? *Hebert v. Louisiana, supra* [272 U. S. 312, 71 L. Ed. 270]. The answer surely must be 'no.' What the answer would have to be if the state were permitted after a trial free from error to try the accused over again or to bring another case against him, we have no occasion to consider. We deal with the statute before us and no other. *The state is not attempting to wear the accused out by a multitude of cases with accumulated trials. It asks no more than this, that the case against him shall go on until there shall be a trial free from the corrosion of substantial legal error.* State v. Felch*, 92 Vt. 477; 105 Atl. 23; *State v. Lee, supra* [65 Conn. 265, 30 Atl. 1110].

This is not cruelty at all, nor even vexation in any immoderate degree. If the trial had been infected with error adverse to the accused, there might have been review at his instance, and as often as necessary to purge the vicious taint. A reciprocal privilege, subject at all times to the discretion of the presiding judge, *State v. Carabetta,* 106 Conn. 114; 127 Atl. 394, has now been granted to the state. *There is here no seismic innovation. The edifice of justice stands, its symmetry, to many, greater than before."* (Italics ours.)

(It should be remembered, in considering the foregoing quotation, that the statute with which the court was dealing was much broader than the statute with which we are concerned. It permitted an appeal by the state from a jury verdict.)

Candidly speaking, it is most unlikely that those who drafted our constitution, and the people who adopted it, greatly concerned themselves with the constitutional provision under discussion, or had any clear or fixed idea of its technical meaning. It is more likely that the provision was inserted in Article 1, entitled "Bill of Rights," because it was in the Federal bill of rights and had been included in the constitutions of practically all of the states that had theretofore entered the Union.

Nevertheless, it is standard practice, when construing the meaning of a constitutional provision, to inquire: What was the accepted meaning of the words used at the time the provision was adopted? Usually, that meaning must be sought from extrinsic sources, and, when the language to be construed is a legal phrase or term, the meaning is sought in the former or current decisions of the courts.

In adopting that method in the instant case, we must not be led to a wrong conclusion by the hundreds of decisions which flatly state that one has been once in jeopardy if he has been acquitted by a jury, or by the more inclusive statement, when he has been once acquitted. Obviously, this was a necessary conclusion where the existing criminal procedure allowed no appeal, which, until lately, except in the case of Connecticut and Vermont, was almost invariably the case. Prior to the appearance of the opinion in the *Lee* case in 1894, there were few satisfactory discussions of the ques-

tion involved here, that is, whether the state may change or add to its procedure by making an appeal available to the state in order to achieve a final determination of the guilt or innocence of the defendant free from legal error.

However, there was a prior opinion which foreshadowed the whole theory of that case, and the theory for which the state here contends. This opinion was handed down by the supreme court of the District of Columbia in *United States v. Bigelow*, 3 Mackey's Reports (D. C.) 393, in 1884, a few years before our constitution was adopted. The opinion is thirty-four pages in length, and is largely devoted to refuting many of the illogical theories then prevailing as to double jeopardy by quoting from the English decisions. At page 419, the court conceded, as everyone must concede, that a clear constitutional provision is unalterable by judicial practice or by legislation, but it goes on to say:

*"If the Constitution does not embody by implication any rule for determining . . . when the equivalent of a former trial exists, that rule, being outside of the Constitution, is open to change and modification, either by judicial practice or by legislation; so that circumstances which would be equivalent to and constitute a former trial and acquittal at one time would not do so at another. . . . Clearly the Constitution cannot be said to include the equivalent of a former trial and acquittal, when the means of ascertaining that equivalent are not governed by it."* (Italics ours.)

▮▮▮ We think this statement is sound. The right of the legislature to prescribe how persons charged with crime shall be tried is limited by the requirement of due process and such constitutional provisions as that requiring jury trial, to be confronted by the witnesses against him, and so forth. But subject to those limitations, and others of a similar character, its power to regulate criminal procedure is plenary. Obviously, the prohibition against double jeopardy prevents the legislature from providing that one may be tried more than once for the same offense; but we find nothing in the constitution which indicates any intention to require the maintenance of the exact trial procedure which existed at the time of its adoption.

In the questioned act, the legislature has provided, in effect, that one has not been tried when he has been discharged by a mere order of a trial judge, or, to requote the words of the statute, by "any order which in effect abates or determines the action or discontinues the same otherwise than an acquittal of the defendant by the jury." Prior to the passage of the questioned act, the legislature had provided that a criminal trial was ended, as far as the state was concerned, by an acquittal on the merits, and, as we have seen, the trial judge could acquit on the merits. Now, it has provided that, unless the acquittal is by a jury, the trial is not ended. The state may appeal to this court. Whether or not it could have gone still further and provided an appeal even from an acquittal by a jury, as the American Law Institute was to recommend a decade later, is not here for decision.

Furthermore, a legislative act is entitled to the presumption of constitutionality, and even if, at the end of this long inquiry, we should be in doubt as to the true intent of the double jeopardy clause of our constitution, we would still be required to hold the questioned act constitutional. The line between the two divergent views was sharply defined by the supreme court of the United States in construing an equivalent clause in the Federal constitution in *Kepner v. United States.* Five judges who constituted the majority were of one view; three, of the other. But twenty-three years later the same court said, in its decision in *Palko v. United States, supra,* that right-minded men could reasonably believe in the position taken by the dissenters in the *Kepner* case. If so, we must concede that the men who drafted our constitution and participated in its adoption may have had a like view as to the meaning of its double jeopardy provision. It is certainly impossible to demonstrate that they did not, and it is elementary that all doubts as to the constitutionality of a legislative act must be resolved in favor of its constitutionality. *State ex rel. Todd v. Yelle,* 7 Wn. (2d) 443, 450, 110 P. (2d) 162.

We hold that subdivision (5) of § 2183-1, Remington's Re-

vised Statutes, is a valid enactment. The motion to dismiss this appeal is, therefore, denied.

In our consideration of the constitutional question involved, we have felt compelled to express doubts as to the soundness of that line of decisions represented by the *Kinghorn* and *Ulmo* cases; and should we stop at this point, that phase of the matter would be left in confusion and uncertainty. The rule of those cases is a serious obstacle to a just and sane administration of the criminal law. This may be best shown by a concrete illustration.

Several years ago, two defendants were brought to trial in King county, charged with the extraordinarily brutal murder of two Seattle police officers. After the jury had been selected and sworn, an overzealous prosecutor, in making his opening statement, said, in substance, that the evidence would show that both had served time for robbery and burglary, and, in view of these facts and facts of a similar nature, "the state is going to ask you to hang these two men." After that occurrence, as this court later held, a legal conviction was absolutely impossible, since the error was so grave that it could not even be cured by an instruction. *State v. O'Donnell*, 191 Wash. 511, 71 P. (2d) 571.

Nevertheless, the trial dragged on for more than two weeks. During its course, one of the defendants, Joseph O'Donnell, took the witness stand and testified, under oath, exactly how, in order to escape arrest, he had killed one of the officers by a blast from a sawed-off shotgun. Both defendants were convicted of first degree murder, and the death penalty assessed against Joseph O'Donnell. On appeal, the conviction had to be set aside, and the defendants again clothed with the presumption of innocence. After another long and expensive trial, the defendants were again convicted, and, after another appeal to this court, they finally paid the penalty, but not until four years after the crime was committed.

No course was open to the trial judge other than to let the first trial go on, despite the fatal error in the record; for had he, with the commendable purpose and intent of in-

suring the defendants a fair trial, dismissed that jury and impaneled another, he would have acquitted the defendants by that very act. We quote from *State v. Wilson*, 91 Wash. 136, 157 Pac. 474, a case not hitherto mentioned in this opinion:

"The rule is that, when the accused is placed upon trial in a court of competent jurisdiction upon a sufficient indictment or information, before a jury legally impaneled and sworn, the discharge of the jury without the consent of the accused is equivalent to an acquittal of that charge. *State v. Kinghorn*, 56 Wash. 131, 105 Pac. 234, 27 L. R. A. (N. S.) 136."

(Quoted and approved in *State ex rel. Lukich v. Superior Court*, 145 Wash. 450, 260 Pac. 671.)

The foregoing is a correct statement of the rule as conceived by the early cases to be implicit in the constitutional provision forbidding double jeopardy. As thus stated, it admits of no exceptions and, as we have hitherto seen, was literally applied as late as 1888 in a case wherein a defendant sentenced to death went free from all punishment because, in a former trial, a jury which had been deadlocked for five days and nights was discharged without his consent. *Commonwealth v. Fitzpatrick*, 121 Pa. 109, 15 Atl. 466. It is now everywhere held that a defendant has not been acquitted when a jury has been discharged without the defendant's consent, on account of failure to agree on a verdict, and many other exceptions to the alleged rule have been created—so many, in fact, that only a few can be here mentioned.

It is now almost universally held that a dismissal of a jury without the defendant's consent will not acquit a defendant if done on account of illness or death of the trial judge, the defendant, or a juror, and, in some cases, on account of the death or serious illness of a close relative of a judge or a juror. In some states it has been held that, when a jury separates, after retiring and before verdict, and is thereupon discharged without the defendant's consent, the defendant has been in jeopardy; in others, that he has not. In the majority of jurisdictions, it is held, as in our own

*Ulmo.* case, that, when a jury has, in the absence of the defendant and his counsel, been discharged on account of a failure to reach an agreement, the defendant stands acquitted, has therefore been once in jeopardy and cannot be retried.  Other courts have held to the contrary.  New exceptions are constantly being made as new circumstances require.

However, without any exception which we have encountered, the courts, in thus modifying the alleged rule, have, in so doing, clung to the idea that there is implicit in the double jeopardy provisions of their respective constitutions a prohibition against the dismissal of a jury without the defendant's consent.  If this be so, how can the courts lawfully emasculate and whittle away the prohibition by creating a multitude of exceptions?  The answer must ultimately be that there is no such implicit prohibition.  That there is not is, to our minds, soundly demonstrated in the opinion in *United States v. Bigelow,* 3 Mackey's Reports (D.C.) 393. Beginning at page 412, the opinion examines the matter at length, quotes from the early English text writers and from English decisions up to 1866, about twenty years before the opinion was written, and arrives at the following conclusion, at page 418:

"And it seems to be clear that this rule has not effectively assumed at any time to be a rule of the common law in the sense which is necessarily insisted on when it is said to be an implied term of our constitutional rule.  Its very fluctuations lead to the conclusion that, as formulated at different times, it only purported to be an effort of the judges to lay down a guide for judicial discretion; that it was nothing more than a rule of practice, subject to judicial control, and in its nature liable to change in order to meet exigencies as they should arise.  We think, therefore, that the first part of defendant's proposition, as we have formulated it, namely, that when the Fifth Amendment was adopted there was a definitive rule of the common law which determined when a jury might properly be discharged, is not maintainable. Of course it follows that, if there was no such definitive rule, but only a judicial practice, necessarily and actually fluctuating, it is not admissible to assume that this fluctuat-

ing rule of practice was, in contemplation of the Constitution, a fixed and positive rule. And as the proposition that an improper discharge of the jury is, in the sense of the Constitution, a trial and acquittal, and for that reason a bar to further jeopardy, depends absolutely upon the existence of a fixed rule for determining when a discharge *is* improper, that proposition also must fall."

But whether or not it was a mere rule of practice in the English courts and despite universal protestations of adherence to constitutional principles, it has become no more than that in the American courts. An examination of a vast number of American decisions has convinced us of the truth of the following statement:

"The American cases hold generally that there must be a manifest necessity for the discharge of the jury and leave the courts to determine in their discretion whether under all the circumstances of each case such necessity exists. When such necessity exists, a plea of former jeopardy will not prevail on a subsequent trial." 22 C. J. S. 394, § 258.

The case of *State v. Kinghorn,* 56 Wash. 131, 105 Pac. 234, is hereby overruled; also, the cases of *State v. Wilson,* 91 Wash. 136, 157 Pac. 474; *State ex rel. Lukich v. Superior Court,* 145 Wash. 450, 260 Pac. 671; and *State v. Ulmo,* 19 Wn. (2d) 663, 143 P. (2d) 862, 150 A. L. R. 759, but only in so far as they approve the rule that, if a jury, sworn to try a criminal case, be discharged without the defendant's consent, the discharge is equivalent to an acquittal, and a defendant so discharged has, in the constitutional sense, been once in jeopardy.

The merits of the case will be dealt with summarily, since the alternative method would involve an analysis and weighing of the evidence, which, in view of the disposition we have concluded to make of the appeal, might result in prejudice to one or the other of the parties to the cause. As to this phase of the appeal, we think it sufficient to say that we have carefully examined the evidence submitted by the state, and, in spite of certain weaknesses commented on by the trial court, it is our opinion that it was sufficient to establish a *prima facie* case.

The order appealed from is, therefore, reversed, and the cause remanded to the superior court of King county for further trial.

ALL CONCUR.

---

February 15, 1945. Petition for rehearing denied.

[1] Reported in 154 P. (2d) 801.