[No. 32403. Department Two. September 29, 1953.]

THE STATE OF WASHINGTON, *Respondent*, v. FRED E. STACY, *Appellant*.[1]

[1]Reported in 261 P. (2d) 400.

Fred Stacy, pro se.

Don G. Abel and Paul B. Fournier, for respondent.

FINLEY, J.—The question presented in this appeal is whether a trial court errs in accepting a plea of guilty, *made on the advice of counsel,* where the plea is on its face equivocal and couples a protestation of innocence with the admission of guilt.

Fred Stacy was brought to trial in the superior court for Grays Harbor county on charges of first degree kidnaping and first degree assault. Stacy was represented at his trial by two members of the bar, Mr. Ray DeKraay and Mr. Orville Peebles, who each had twenty and twenty-five years' experience, respectively, at the bar. As the trial proceeded and as the state put on its witnesses, a strong case was built up against the defendant.

On the second day of the trial, after the state had put on most of its witnesses, the defendant, his mother, wife and aunt, and his attorneys met in conference with prosecutor Paul Fournier and a deputy sheriff during the morning recess. Allegedly, the prosecutor stated that, unless the defendant changed his plea of not guilty to that of guilty, the state could and would have Stacy confined to a hospital for the criminally insane for the rest of his life. The defense attorneys appeared to be apprehensive that the jurors would believe the strong case theretofore built up against the defendant, and apparently thought it was likely that defendant would get a life sentence on the kidnaping charge or might even receive the death sentence. The prosecution was willing to drop the more serious kidnaping charge, if the de-

fendant would plead guilty to a charge of first degree assault. The defense attorneys urged the defendant to plead guilty to the charge of first degree assault. He agreed to do so.

In this connection, the record shows that the following occurred:

"[After returning from the conference held at the recess]

"MR. FOURNIER: If your Honor please, at this time Mr. Peebles and I and Mr. DeKraay, having talked this matter over, and with the consent of the defendant, it is my understanding that the defendant wishes to withdraw his plea of not guilty by reason of insanity and enter a plea of guilty to the crime of FIRST DEGREE ASSAULT, and with that understanding, if the defendant does so plead, I would move that the FIRST DEGREE KIDNAPPING count be dismissed. THE COURT: You ask leave of this Court to withdraw your former plea? MR. PEEBLES: That is correct, your Honor. THE COURT: Have the defendant come forward then. (Defendant comes forward to the bench) Then it will be granted, a leave to withdraw his former plea of not guilty to both counts of the Amended Information, and also his plea of not guilty by reason of insanity. Do you desire to have the Amended Information read? MR. PEEBLES: No, we do not. We will waive the reading of the Information, your Honor. THE COURT: All right. I will ask you, Mr. Stacy, as to Count 2 of the Amended Information, which charges you with FIRST DEGREE ASSAULT, how do you plead to that, guilty or not guilty? MR. STACY: I plead guilty to that charge, your Honor, and I would like to make a statement to that charge. Even though I am pleading guilty to that charge, *it is a lie on my part. I am doing so on the advice of counsel.*" (Italics ours.)

When subsequently brought before the court for sentencing, the defendant again made a statement of an equivocal nature as to whether or not he was guilty. Asked by the court if he had anything to say before the judgment was pronounced, Mr. Stacy made the following statement:

"MR. STACY: I said at the very start I was not guilty and challenged the prosecution three different times to give the truth serum, *and now I am pleading guilty on the advice of my wife.*" (Italics ours.)

Overlooking the equivocal nature of the change of plea, the trial court sentenced the defendant to twenty years in the penitentiary at Walla Walla on an amended information charging the defendant with first degree assault.

On December 30, 1952, a motion was made to vacate the judgment. At the hearing on the motion, on January 26, 1953, the defendant represented himself. He contended that his plea of guilty to the amended information, charging him with first degree assault, had been wrested from him by duress exercised by his defense attorneys and by the threats of the prosecution. It was also contended that this same duress was exercised over the defendant's mother and his former wife so they would induce him to accept the change of pleas as recommended by counsel. The trial court denied the motion to vacate the judgment, and defendant Stacy has appealed.

There is no doubt that defendant Stacy expected that his pleading to the charge of first degree assault would remove the threat of life imprisonment and, perhaps, the threat of a death sentence relative to a possible conviction on the kidnaping charge. Despite any benefits anticipated by the defendant, the question before us is whether the purported plea of guilty, *although made on the advice of counsel*, was so equivocal on its face that the trial court should have required the defendant to stand trial rather than to accept such an equivocal plea.

At this point, we note that cases (such as *Thorne v. Callahan,* 39 Wn. (2d) 43, 234 P. (2d) 517), which involve equivocal pleas (a) made without the benefit of legal counsel and (b) made at the time of arraignment, are not strictly applicable to the case at bar because here we have a plea of guilty, made (1) on the advice of counsel, and (2) after the state had practically finished its case against the appellant—that is, after more than one day of trial. Furthermore, the *Thorne* case involved the question of whether certain equivocal language used by the accused amounted to a waiver, intelligently and understandingly made, of the *right to counsel.*

Where a clear-cut plea of guilty is made on the advice of counsel, and where counsel is experienced and able to weigh the desirability of pleading guilty to a lesser offense rather than risking all against the hazard of losing on a greater offense, there would seem to be little doubt that a knowing, intelligent choice is exercised in making the plea of guilty. This would be especially true in a case such as the one at bar, where the state has built up a devastating record against the appellant before he made his change of pleas.

But the case at bar is not quite so simple. The record shows that a plea of not guilty by reason of insanity was withdrawn and an equivocal or self-contradictory plea of guilty was substituted.

. As the trial was stopped during the state's case and the matter was disposed of on the basis of the plea of guilty, the defendant presented no witnesses and, obviously, did not take the stand. However, in his brief on appeal, Mr. Stacy went outside the record and stated that he is a World War II veteran; that, following hospitalization during the war for a neurotic condition, he underwent a prefrontal lobotomy, improved after the operation, married, and had three children; that in 1951, with the onset of marital difficulties, he became nervous again and was subject to spells of amnesia and that he decided it best to seek psychiatric advice; that in November of 1951, he set out for the veterans' hospital in Seattle and, upon reaching Aberdeen, began to suffer from depression and an intense anxiety; that, fearing he might harm himself or someone else, he went to the local police authorities and had himself locked up for protection; that arrangements were made with the veterans' administration authorities to have him transferred, but, before the transfer could be effected, he was sent on his way by a police officer, who did not know of the prior arrangements, and who told him that the city was not running a hotel. He was unable to start his car and decided to hitch-hike to Seattle, as there was no bus leaving for Seattle until nine a. m. the next morning.

The state's witnesses testified that Mr. Stacy, while hitch-hiking toward Seattle, was picked up and given a ride by

them. That Stacy appeared to be rational and conducted himself properly for a short time thereafter, but then drew a hunting knife and threatened to use it on one of the women passengers in the car unless the driver and other passsengers followed his directions. They testified that he stated he was on his way to Seattle to kill a doctor. After the car had proceeded from around McCleary to a point between Olympia and Tacoma, Stacy ordered the driver to turn around and to drive to Portland. He permitted a woman passenger to leave the car temporarily to go to a restroom; she got word to the police and the car was stopped in Centralia and Stacy was arrested.

■ It is our opinion that, under the circumstances, the trial court erred in accepting the equivocal plea, even though it was made pursuant to the advice of competent counsel. While the trial court can accept a plea of either guilty or not guilty, we believe that, nevertheless, the important considerations which are presented in each criminal case require that, whenever a defendant attempts to make a plea which by its very wording couples a protestation of innocence with an assertion of guilt, the trial court should refuse to accept the plea until the equivocation therein has been eliminated; and, if the defendant persists in attempting to enter such a plea, the trial court should require the defendant to stand trial on the offense charged.

Such a rule is consistent with the orderly and proper administration of justice in criminal cases. It clearly protects the defendant's right to an opportunity to establish his innocence in a trial before a jury. Furthermore, it obviates a collateral attack on a judgment (as in the instant case, or in a *habeas corpus* proceeding) by a later claim that the plea was too equivocal to bind the pleader so as to permit entry of judgment and imposition of sentence by the trial court.

In a case such as the one at bar, where the chief defense of the defendant was insanity; and where the accused apparently claimed a prior history of insanity, there may be grave doubt as to the competency of such a defendant to accept the advice of counsel as to a plea of guilty.

We are aware of our recent decision in *State v. Rose,* 42 Wn. (2d) 509, 256 P. (2d) 493, where, under somewhat similar but less striking facts, we refused to go along with the defendant's claim that he had not made a *bona fide* plea of guilty. But analysis of that case shows that the rule herein announced and the rule of the *Rose* case can stand side by side very consistently. In the *Rose* case, we decided that a valid plea of guilty had been entered, despite some measure of equivocation, and we noted that the equivocal matter wherein the defendant asserted innocence had come in *after* the plea and was offered in the hope of reducing the severity of the sentence. Our reliance on *People ex rel. Hubert v. Kaiser,* 206 N. Y. 46, 99 N. E. 195, and the reasoning of that case, indicates this distinction clearly.

We cannot take very seriously the argument advanced by the state that in our disposition of this appeal Mr. Stacy should not be permitted to prevail, as thereby he might be allowed to get away with cunningly bargaining to free himself of the kidnaping charge, and then, with that charge out of the way, he might escape *totally* by getting out from under his bargain and avoiding conviction on the assault charge. There is certainly no reason apparent to us why appellant Stacy cannot again be prosecuted on the first degree assault charge; furthermore, as we see the matter, it would seem to us to be discretionary with the prosecuting attorney as to whether the kidnaping charge should be again asserted and pressed against appellant Stacy. The latter result may seem to be inhibited by some facet of the concept of double jeopardy, but we do not think so, as will be indicated hereinafter.

There has been, and in some quarters is still current, a considerable amount of confusion and misunderstanding respecting the doctrine of double jeopardy. In *State v. Brunn,* 22 Wn. (2d) 120, 154 P. (2d) 826, 157 A. L. R. 1049, the late Judge Robinson made a valiant and most studious effort to turn back the tide of misunderstanding, or at least a certain portion of it. Both time and space may be saved here by reference to the *Brunn* case without quoting at

length or attempting to paraphrase Judge Robinson's discussion of the double jeopardy doctrine. (See, also, 35 Yale Law Journal 674.) However, some discussion here of the aspect of the *Brunn* decision relative to double jeopardy may may be helpful. Therein, it is pointed out that apparently the early American judicial concept of double jeopardy may be traced mainly from (a) the arbitrary practice of early English criminal court trial judges in dismissing lenient or defendant-minded juries and continuing or reinstating prosecutions before subsequent juries, deliberately to obtain convictions of criminal offenders; and (b) the English procedure of those days that trial court determinations were final, without benefit of an established appellate review. Although the origin of the doctrine of double jeopardy thus is readily understandable as a very humane reaction to the harshness and injustice of specific abuses or facets of English judicial conduct and criminal procedure in an early period of English legal history, it should be remembered that the doctrine of double jeopardy developed to meet specific abuses which no longer exist. Failure to recognize this fact has resulted in extreme and unwarranted interpretations and applications of the doctrine in many instances, both in state and Federal courts of our country.

In our own jurisdiction, in *State v. Kinghorn*, 56 Wash. 131, 105 Pac. 234, a misconception of the doctrine of double jeopardy resulted unnecessarily in a defendant (charged with rape) escaping prosecution, being turned loose, and going forever free, any considerations regarding the protection of the public to the contrary, notwithstanding. As pointed out in the *Brunn* case, the facts in the *Kinghorn* case were as follows:

"A jury was impaneled and sworn. The prosecuting witness was called to the stand, and the preliminary questions propounded, whereupon the defendant objected to the introduction of any further evidence and moved to dismiss the case, on the ground that he had not been arraigned and had not pleaded. The defendant was thereupon arraigned and pleaded not guilty. On the motion of the state, the jury was discharged and a new jury immediately impaneled and

sworn to try the case, whereupon the defendant pleaded former jeopardy. The plea was denied, and the trial proceeded to a conviction. On appeal, this court held that he had been once in jeopardy, during the few moments he spent before the first jury, and for that reason the conviction was reversed and the defendant went forever free."

The *Brunn* decision further points out the following:

"The rule applied in the *Kinghorn* case, that a defendant was once in jeopardy if, after being sworn, the jury was discharged without his consent, was applied literally as late as 1888. A defendant convicted of murder in the first degree went free under this rule in *Hilands v. Commonwealth*, 111 Pa. 1, 2 Atl. 70, 56 Am. Rep. 235, and two years later another defendant charged with murder escaped trial because, at a former trial, the jury was, without his consent, discharged after having been out five days. *Commonwealth v. Fitzpatrick*, 121 Pa. 109, 15 Atl. 466, 6 Am. St. 757, 1 L. R. A. 451. It was held by this court, but little more than a year ago, that, when a jury was discharged without the personal presence of the defendant or his counsel in the courtroom at the time, the defendant had been once in jeopardy and could not be tried again. *State v. Ulmo*, 19 Wn. (2d) 663, 143 P. (2d) 862, 150 A. L. R. 759."

The *Kinghorn* case and others following the *Kinghorn* doctrine were specifically overruled by the *Brunn* case. To us, one passage in *Brunn* seems particularly significant and helpful in connection with our consideration of the instant case. We refer to the following language, beginning at p. 143:

"It is now everywhere held that a defendant has not been acquitted when a jury has been discharged without the defendant's consent, on account of failure to agree on a verdict, and many other exceptions to the alleged rule have been created—so many, in fact, that only a few can be here mentioned.

"It is now almost universally held that a dismissal of a jury without the defendant's consent will not acquit a defendant if done on account of illness or death of the trial judge, the defendant, or a juror, and, in some cases, on account of the death or serious illness of a close relative of a judge or a juror. In some states it has been held that, when a jury separates, after retiring and before verdict, and is thereupon discharged without the defendant's consent, the

defendant has been in jeopardy; in others, that he has not. In the majority of jurisdictions, it is held, as in our own *Ulmo* case, that, when a jury has, in the absence of the defendant and his counsel, been discharged on account of a failure to reach an agreement, the defendant stands acquitted, has therefore been once in jeopardy and cannot be retried. Other courts have held to the contrary. *New exceptions are constantly being made as new circumstances require.*" (Italics ours.)

Particularly in view of the numerous exceptions recognized respecting the *Kinghorn* definition of double jeopardy, Judge Robinson reasonably concluded that, actually, the doctrine of double jeopardy is simply a rule of practice in American courts, and that the extreme position of the *Kinghorn* definition is not required in a constitutional sense.

■ While it seems obvious to us that the doctrine of double jeopardy in the past has been pushed to unwarranted extremes, most certainly we are not suggesting that it is entirely without merit or constitutional effect as a protection for criminal defendants. The principle is a sound one, but reasonableness must be the key word or thought in interpreting, defining, or applying the principle of double jeopardy. The desirability of finality in verdicts and judgments, the humanitarian ideas of fair play and justice for criminal defendants, and particularly, the applications of the doctrine by early American jurists, deriving from the harshness of early-day English criminal law, must not be overemphasized and little or no emphasis given to the desirability of protecting society through an effective, evenhanded, reasonable administration of criminal justice.

Due process and fair play regarding criminal defendants do not require a criminal trial to be a game of chance with all of the odds heavily weighted in favor of the defendant. For several generations, leaders of the bench and the bar have sought to place the administration of justice upon a sounder basis as to the rights of both plaintiffs and defendants in civil as well as criminal trials. It seems fairly obvious that the ultimate in a criminal trial should be the ascertainment of the truth; that is, whether the accused is innocent and should be set free, or whether the accused

is guilty and should be incarcerated for the protection of society. Again, it should not be a matter of luck or perhaps misadventure of one of the contestants during the course of a trial; nor should the outcome depend substantially upon the skill or luck of the attorney representing one side of the controversy.

■ It seems rather clear in the instant case that the dismissal of the charge of kidnaping (which in effect might be considered a dismissal of the jury, so far as that charge is concerned) was made with the consent of the appellant. In such event, there would be no doubt that, even under the extreme rule of the *Kinghorn* case, there could be no former jeopardy. In view of the confusing plea made by appellant Stacy, and his allegations of coercion upon him to obtain his consent to the arrangement, we might assume without deciding that his consent to the dismissal was not *bona fide*. Even so, in the light of the foregoing discussion, it would seem to us that the appellant would not have been in former jeopardy within the meaning of Article I, § 9, of our state constitution.

It would follow that, within his discretion, the prosecuting attorney may again charge Mr. Stacy with kidnaping in the first degree, as well as first degree assault. In this connection, we think that statutory authority for our conclusion respecting the matter of the kidnaping charge may be found in:

*Rem. Rev. Stat.*, § *2315*: "Dismissal, when a bar. An order dismissing a prosecution under the provisions of sections 2311, 2312, or 2314 shall bar another prosecution for a misdemeanor or gross misdemeanor where the prosecution dismissed charged the same misdemeanor or gross misdemeanor, *but in no other case shall such order of dismissal bar another prosecution.*" (Italics ours.)

Finally, it appears to us that the change of plea by the appellant and the dismissal of the kidnaping charge by the state are inextricably bound up in one and the same transaction; and that, in benefiting from setting the arrangement at naught, the appellant must accept the burden of any disadvantages that may accrue from setting it aside.

Under the circumstances here, this is fair play and justice to the appellant as well as to society. In other words, in according the appellant the right to plead not guilty and to have his case passed upon by a jury, we think it is quite reasonable and not unfair to him for the state to have a somewhat comparable or resulting right to press the kidnaping charge again, as well as the assault charge, and to have a jury pass upon the question of appellant's guilt or innocence. The end result of this is that the appellant will have an opportunity to start all over in defending himself against the state's charges. We see no valid reason why the state should be less privileged as to a new start in pressing the charges.

The judgment of the trial court is reversed, and the appellant is granted a new trial.

GRADY, C. J., SCHWELLENBACH, HAMLEY, and DONWORTH, JJ., concur.

[1]Reported in 261 P. (2d) 414.