[No. 31613. *En Banc.* August 2, 1951.]

LOTTIE THORNE, *Appellant*, v. HARLAN S. CALLAHAN, *as Sheriff of King County, Respondent.*[1]

[1]Reported in 234 P. (2d) 517.

*James Tynan* and *John M. Warnock,* for appellant.

*Charles O. Carroll, Frank A. Harrington,* and *Phillip Sheridan,* for respondent.

DONWORTH, J.—June 15, 1950, Lottie Thorne filed in the office of the clerk of the superior court for King county her petition for a writ of *habeas corpus* directed to Harlan S. Callahan, sheriff of King county, alleging that her son, Fred L. Thorne (herein referred to as Thorne or the prisoner), was then in custody in the King county jail at Seattle pursuant to a judgment and sentence of the superior court for Snohomish county, entered June 5, 1950, finding and adjudging Thorne guilty of the crime of carnal knowledge, and sentencing him to confinement in the state penitentiary for the term of his natural life.

The petitioner alleged that Thorne's restraint was illegal, in that he had been deprived of his rights under the constitution of the state of Washington and the constitution of the United States; that he had been arrested June 3, 1950, and confined in the Snohomish county jail at Everett until he was brought before the superior court at 9:30 a. m., Monday, June 5, 1950; that, June 4th, Thorne was visited in jail by a deputy prosecuting attorney and was advised by the deputy that Thorne's wife had accused him of carnal knowledge of his nine-year-old daughter; that Thorne had no knowledge of the events which occurred about the time the alleged crime was said to have been committed and so

advised the prosecutor, who then told him that he was charged with a serious crime; that he could be sentenced to as much as twenty years' confinement; that it would be best for him to plead guilty, in which case the prosecutor would recommend a light sentence and he would not have to serve more than one year; that the prosecutor further told Thorne that he would be brought before the superior court the following morning and asked if he desired an attorney, to which he should answer in the negative; that the information filed against him would be read; that he would be asked what he desired to plead to the charge; and that he should tell the court that his plea was guilty.

The petitioner then alleged that, relying upon these assurances and not being acquainted with any attorney, as he was at a distance from his home, Thorne did not consult an attorney or take any steps to ascertain his rights or the possible consequences which might follow his failure to secure an adequate defense; that, June 5, 1950, Thorne was brought before the superior court and the information was read to him, whereupon he was asked what he wished to plead; that Thorne then informed the court that he had no recollection of the events which occurred at the time of the commission of the alleged offense, but that he had been informed that his wife had told the arresting officers that he had criminally assaulted his daughter; that Thorne had no knowledge as to whether this statement was true, but that, if his wife said so, it might be true because she had never lied to him before; and that the court thereupon directed that a plea of guilty be entered, and sentenced Thorne to confinement in the state penitentiary for the term of his natural life.

The petitioner further alleged that Thorne had since learned that, to the knowledge of the prosecuting attorney, no such crime as that with which he was charged was ever committed; that the advice given him by the prosecuting attorney was fraudulent, and consequently the judgment and sentence imposed were void; that, to the further knowledge of the prosecuting attorney, Thorne's mind was in

such a state, due to his having indulged freely in intoxicating liquor during the afternoon and evening of June 3, 1950, that he could not realize the nature of any acts performed by him during the time in question; that Thorne had for a period of years indulged in intoxicating liquor to excess; that he suffered from amnesia; that, after he was arrested, he was mentally confused and did not recover possession of his mental faculties until after the rendition of judgment and the imposition of sentence; that his condition from the time of his arrest until after the imposition of sentence "was one of temporary insanity"; that his plea of guilty to the charge was not the action of his normal mind, and that he was not guilty of the crime with which he was charged.

The petitioner prayed that a writ of *habeas corpus* be issued requiring the sheriff to bring Thorne before the court.

On the day the petition was filed, an alternative writ of *habeas corpus* was issued by the superior court, requiring respondent sheriff to bring Fred L. Thorne before the court at the time and place fixed in the order or show cause why he should not do so.

June 24, 1950, respondent sheriff filed his return, alleging the facts above stated concerning Thorne's arrest; that an information had been duly filed charging Thorne with the offense above referred to; that Thorne had entered a plea of guilty to the information, and that he had been sentenced to life imprisonment, copies of the information, judgment and sentence, and the clerk's minute entries being attached to the return. Respondent denied the allegations concerning Thorne's mental incapacity and alleged that Thorne had been accorded all of his legal and constitutional rights, and that he was held in confinement pursuant to a valid judgment and sentence rendered by the superior court for Snohomish county.

A trial lasting four days was had before the superior court for King county (the statement of facts comprises 431 pages of testimony), with the result that the petition for a writ of *habeas corpus* was denied. Petitioner's motions for a new trial and for reconsideration of the matter by the

court having been denied, the trial court, July 14, 1950, filed an order quashing the alternative writ of *habeas corpus* theretofore issued, from which order petitioner gave oral notice of appeal to this court, seasonably supporting the same by filing a cost bond. A later order further provided that the expense of the appeal to this court should be borne by King county.

Appellant presents the following assignment of errors:

"The court erred:

"(1) In holding that the plea of guilty was in proper form and was properly received.

"(2) In holding that no constitutional or statutory right was violated in not offering one day to plead.

"(3) In holding that there was an understanding waiver of the right to counsel, and that no constitutional rights were violated in accepting the plea without counsel, under the circumstances of this case.

"(4) In holding that there was error without prejudice in the admission and consideration of Exhibit '3', the statement of the defendant relating to another and unrelated incident.

"(5) In holding that the defendant was not deceived or misled by the statements of the deputy prosecuting attorney.

"(6) In holding, at least inferentially, and basing his decision upon, the erroneous hypothesis that there may be a parole after sentence for the crime involved.

"(7) In refusing to discharge the prisoner or grant him a new trial, and in quashing the writ.

"(8) In holding that the actions of the prosecuting attorney before the arraignment, and the actions of the sentencing judge upon the arraignment and plea, were not violative of the prisoner's rights under the Fourteenth Amendment to the Constitution of the United States."

In view of the conclusion we have reached, we will discuss only that portion of the testimony pertaining to assignments of error Nos. 3, 5, 6, and 8.

In connection with the questions here presented, it is appropriate to note that, by Laws of 1947, chapter 256, § 2, p. 1070, Rem. Supp. 1947, § 1085-2, the legislature added to the statutes in regard to *habeas corpus* proceedings the following section:

"In the consideration of any petition for a writ of habeas corpus by the Supreme Court, whether in an original proceeding or upon an appeal, if any Federal question shall be presented by the pleadings, it shall be the duty of the Supreme Court to determine in its opinion whether or not the petitioner has been denied a right guaranteed by the constitution of the United States."

At the hearing before the superior court, Thorne, on whose behalf the petition for a writ of *habeas corpus* had been filed, was called as a witness, testifying that his name was Fred L. Thorne, Jr.; that he lived with his family, consisting of his wife and four children, at Perrinville, two or three miles north of Edmonds; and that his eldest child, Lottie Lee Thorne, became nine years of age June 8, 1950.

By the information, dated June 5, 1950, Thorne was charged

". . . with the crime of carnal knowledge, committed as follows, to-wit:

"That he, the said Fred L. Thorne, Jr., in the County of Snohomish, State of Washington, on or about the 3rd day of June, 1950, wilfully, unlawfully and feloniously did carnally know and abuse one Lottie Lee Thorne, then and there a female child of the age of eight years, and not then and there the wife of the said Fred L. Thorne, Jr., contrary to the form of the statute in such case made and provided and against the peace and dignity of the State of Washington."

The offense charged was based upon Laws of 1943, chapter 112, § 1, p. 256, Rem. Supp. 1943, § 2436, which reads in part as follows:

"Every male person who shall carnally know and abuse any female child under the age of eighteen years, not his wife, . . . shall be punished as follows:

"(1) When such an act is committed upon a child under the age of ten (10) years, by imprisonment in the state penitentiary for life; . . ."

It should be borne in mind that it is entirely immaterial to the issues here presented whether or not Thorne is guilty as charged in the information quoted above.

It is necessary to now consider the events occurring prior to petitioner's waiver of counsel and plea of guilty. He was

arrested about 9:30 p. m. Saturday night and lodged in jail. He had been drinking some whiskey and a considerable amount of beer throughout the day. He was questioned by officers twice that night. The next day (Sunday), he was confronted with his eight-year-old daughter (the victim of the alleged crime) and his wife, who exhorted him to admit his guilt and save the family from humiliation and disgrace. The deputy prosecutor joined Mrs. Thorne in urging him to plead guilty. Following this meeting, he had a conference with a deputy sheriff and the deputy prosecutor regarding the probable penalty if he pleaded guilty. On Monday morning, he was arraigned and pleaded guilty under the circumstances hereinafter described, and at 1:30 p. m. of the same day the judgment and sentence were signed whereby he was ordered confined in the state penitentiary for the balance of his life.

Immediately after his wife and daughter left the jail on Sunday, the conference above referred to between the prisoner and the deputy prosecutor and a deputy sheriff took place. They discussed what would happen to the prisoner if he would plead guilty to a charge of carnal knowledge the next morning. The prisoner had never been in court before in his life. The deputy sheriff testified that he told him that the only possible sentence was life imprisonment. The prisoner claims that he was informed that the maximum penalty was twenty years of penal servitude.

However, the deputy prosecutor told the prisoner that a minimum sentence would be set by the board of prison terms and paroles after the prisoner began serving his sentence. The deputy sheriff told him the same thing. He was further given to understand at that interview that if he would plead guilty to the carnal knowledge charge, the deputy prosecutor would not charge him with certain lesser offenses in regard to his daughter. He testified that he was further advised as to the probable court procedure at his arraignment and was told that he would not need the services of an attorney. The deputy sheriff and the deputy prosecutor each denied this last charge in their testimony.

For the purpose of this opinion, the testimony of the prisoner concerning this conference (which is, of course, favorable to his position) will be disregarded, and only that of the deputy sheriff and deputy prosecutor considered. On direct examination, the latter volunteered the following:

"A. It is something I recall to mind that I want to mention. It's my recollection that in connection with the information that was given Mr. Thorne relative to the sentences, as I say, I personally told him that the court was required under the law to sentence him to the maximum, that thereafter the court would recommend a minimum, and our office would do likewise, that the office, that the Board of Prison Terms and Paroles was the organization which actually fixed the time he would serve; and it is my recollection that at that time I gave him an illustration, and as I recall it, I took the case of grand larceny, which is a common crime, an auto theft case as I recall it, and explained that the maximum penalty for grand larceny was 15 years, that thereafter, that the court was bound under the law to sentence the man to 15 years, that thereafter, depending upon the circumstances of the case, the age of the offender and so on and so forth, whether he had any prior convictions and what-not, the court would make a recommendation as to the minimum sentence. And I may have mentioned some specific period, say 18 months or 15 months or 2 years or some such thing, and that our office would do likewise but that the Board of Prison Terms and Paroles was the organization which actually fixed the time. Now that's my recollection that I gave him such an illustration. Now I didn't say anything with reference to the crime of carnal knowledge, because as I said, I didn't know what the penalty was. Mr. Lawe had informed him it was life. As I say, I thought Mr. Lawe was wrong and I didn't want to say anything to mislead the defendant."

On cross-examination, the deputy prosecutor further testified:

"Q. You just mentioned to him that in some case such as grand larceny or automobile theft— A. Yes. Q. That the maximum would be 15 years, but the court recommends something less and the Parole Board fixes it at say 15 or 18 months, is that right? A. In substance. Q. You said that is what happens quite often? A. No, I just gave a general illustration as I recall it, telling him that the court was

bound under the law to sentence an individual to the maximum time prescribed by law, that thereafter the court made a recommendation as to the time that the man should serve, that our office did likewise, but that the organization which actually fixed the time a person should serve was the Board of Prison Terms and Parole—."

That the deputy prosecutor (who joined Mrs. Thorne in urging her husband to plead guilty) appreciated the serious difficulty in obtaining a conviction which would confront him if the prisoner pleaded *not guilty* to a carnal knowledge charge is shown by his own testimony:

"Q. Well, at that time as you say, you hadn't made up your mind whether to charge him with carnal knowledge, indecent liberties, incest or contributing to the delinquency of a minor. In other words, on that Sunday afternoon you had hardly decided what you wanted to charge him with, had you? A. Well, I may explain it this way. Q. Go ahead. A. He had decided to plead guilty to carnal knowledge, and then at the end of the interview I said, 'Now what you have done constitutes these various things which I have related.' And I said, 'I might charge you with indecent liberties.' And the reason for that is this. We had a situation where I didn't know whether Mr. Thorne would plead guilty because I don't know whether they are going to plead guilty when I take them over for arraignment. And I knew we'd be confronted with a trial if he didn't. I knew the wife, I didn't believe the wife would testify. I didn't know how the victim would stand up in court and I wanted to discuss the matter with Mr. Sheridan before finally deciding what to do about it. Q. So when you left that afternoon, you hadn't decided? A. No, at that time I hadn't."

The advice thus given to the prisoner by the deputy prosecutor and the deputy sheriff was misleading and erroneous in this material respect:

The board of prison terms and paroles under the express provisions of Rem. Supp. 1947, § 10249-2, had no authority to fix any minimum term for a person convicted of carnal knowledge of a child under ten years of age. *Hence, the maximum sentence imposed would also be the minimum sentence.* The prisoner was permitted to go into court for arraignment and sentence under the delusion that,

no matter what maximum sentence might be imposed, the board of prison terms and paroles would fix his actual term of confinement at a few years. Parenthetically, the fact that the legislature has since enacted chapter 238, Laws of 1951, amending § 10249-2, Rem. Supp. 1947, in certain particulars, has no bearing on this case.

The result of his waiving his right to counsel at his arraignment was very serious, because counsel would have advised him as to his constitutional right to decline to testify against himself and further that he could prevent his wife from testifying against him. Consequently, he did not know that, if he should request to have counsel appointed for him by the court and plead not guilty, he would have a reasonable chance of being acquitted because:

1. The prisoner could not be compelled to testify;

2. His wife could not testify against him unless he consented; and

3. His eight-year-old daughter's testimony might not be believed by the jury after a skillful cross-examination.

Acting upon this misinformation and lack of legal advice, the prisoner upon his arraignment endeavored to carry out his part of the program. The trial judge knew nothing of what had transpired the preceding day between the prisoner and these officials, and consequently the arraignment procedure appeared to him to be entirely regular.

We will now consider the proceedings had in court June 5th when Thorne was arraigned. Thorne testified at considerable length concerning his life history, stating that for some years he had indulged freely in intoxicating liquor, and that, during the month of June, 1950, he was manager of a gravel pit a short distance from his home. Concerning the arraignment proceedings he testified as follows:

"A. The judge then called my name and I stood up. He asked me if my name was Fred L. Thorne, Jr., and I says, 'Yes, Your Honor.' And he asked me if I would, if I cared for counsel, and I says, 'No.' He then told me that every man is entitled to his counsel, and if I wasn't able to get finances to have one myself, that the state would furnish me with one. I told him I didn't care for counsel. He then told me, read the information to me and I was charged with,

as I remember, carnal knowledge. Q. Did you know what that meant? A. At that time I didn't know what that meant. Q. Had anybody told you before that time what it meant? A. Not to my knowledge, no. Q. Had it ever been mentioned before? A. Not to my knowledge. Q. Had anybody told you what the charge was going to be? A. No, sir. Q. Go ahead. A. He then read the charge to me, told me what I was charged with and asked me if I was guilty or not guilty, and I says, 'I don't know, Judge, your Honor.' And he says, 'What do you mean by that?' And I says, 'I was drinking very heavily Saturday and I don't remember anything that went on during the time that I am charged with this count.' He says, 'Are you guilty or not guilty?' And I says, 'I don't know, Your Honor. I don't remember. My wife says I am, so I guess I am.' And that's all I recall. Q. Did you say anything about whether you believed your wife or not? A. No, sir, he didn't. Q. Did you say anything? A. I told him that, as far as I knew, my wife had never lied to me. I guessed I was guilty. Q. And then what happened, Mr. Thorne? A. He then read me, he says, 'The law reads that in a case of this nature, when a child from 10 years or over, the sentence shall be 20 years in the state penitentiary.' He then read, 'For a child under 10 years of age, it shall be life at hard labor in the state penitentiary.' Q. Was there anything else said, Mr. Thorne? A. That's all I recall."

On cross-examination, Thorne testified that, after Judge Bell had read to him the statute providing the penalty for the crime with which he was charged, the judge "asked me if I was guilty or not guilty," and that he replied, " 'I don't know, Judge; I don't remember. I was drinking that Saturday night' "; and that the judge again asked Thorne if he was guilty or not guilty, to which the witness testified that he answered, " 'I don't know, sir; I don't remember. My wife tells me that I am.' "

Judge Ralph C. Bell testified that for more than thirty-five years he had been a judge of the superior court for Snohomish county; that, June 5, 1950, he was presiding over Department No. 1 of that court; that, on the morning of the day referred to, Fred L. Thorne, Jr., was brought before the court, charged with the crime of carnal knowledge; that the information was read to Thorne, who answered that the name appearing on the information was his true

name; that the witness then informed Thorne that the offense with which he was charged by the information constituted a felony, a crime punishable by imprisonment at hard labor in the state penitentiary for a period fixed by law; that the witness asked Thorne whether he was represented by counsel, to which Thorne answered that he was not; that the witness then informed Thorne that it was his right to have a lawyer before he pleaded to the information and that, if Thorne was unable, because of lack of funds, to procure counsel of his own selection, the court would provide him with counsel at public expense; that Thorne then stated that he did not desire counsel, whereupon the witness asked him if he was ready to plead, "that is, to tell the court whether he was guilty or not guilty of the charge that had been read to him"; that Thorne's answer "was not direct and unequivocal as I now recall, though I may not be able to give his exact words. My recollection is that he said, 'Well, I'll plead guilty.'"

The witness testified that he then said to Thorne, "'I want to know whether you are guilty or are not guilty,'" continuing, "and I think, as I remember his answer as being, 'I'm guilty.'"

The witness further testified that the deputy prosecuting attorney, as was the usual custom, made an oral statement of what he deemed to be the facts of the case, placing before the court a written document signed by Thorne relating to another alleged act of misconduct and a printed form purportedly filled in and signed by a physician who had examined Lottie Lee Thorne at forty-five minutes after ten o'clock p. m., June 3, 1950; that the prosecuting attorney then moved that sentence be imposed, whereupon the statute defining the crime with which Thorne was charged was placed before the court; that, after asking Thorne if "he had any reason to give or anything to say why the sentence of the law should not be imposed upon him through that court," the witness either read the statute to Thorne or advised him concerning its exact wording.

The witness stated that, "in the light of the original somewhat indirect plea," he asked Thorne whether he remem-

bered the events set forth in the document above referred to as having occurred, to which Thorne answered that he did. The witness noted that the purported facts therein recited referred to a different occasion than that which resulted in Thorne's arrest and arraignment.

The witness then testified that he had not remembered that the statutory penalty for the offense committed was life imprisonment; that, after examining the statute, he either read it to Thorne or explained it to him, using the exact statutory words defining the crime, and that he then inquired of Thorne whether he desired his plea to stand, to which Thorne answered in the affirmative. In response to a question by the trial court, Judge Bell stated that the sentence was imposed at that time in the language of the statute. The witness then identified certified copies of the information and the judgment and sentence.

The witness next testified concerning his recollection of the statement made by the deputy prosecuting attorney concerning the commission of the offense, its nature, and its discovery, stating that he could not quote the exact words. The witness also testified that Thorne did not criticize the "accuracy or nature of the complaint," and that Thorne answered the witness' questions promptly and responsively. In response to a question as to whether Thorne, by his manner, demeanor, appearance, or speech, indicated that he was not possessed of his faculties, the witness answered:

"In nowise did I have any such thought. I saw him as a man who appeared to be thoroughly ashamed. He stood with head lowered and apparently did not choose to face anyone. The appearance to me was that of a man who appreciated the enormous measure of immorality that was involved and was ashamed and apparently regretful."

On cross-examination, the witness testified that no court reporter was present at the arraignment, such matters being not ordinarily reported. He also testified that the term "carnal knowledge" was not explained to Thorne by the witness nor by anyone else in his presence; that Thorne did say that, on Saturday, June 3rd, he had spent considerable

time in a tavern drinking beer and whiskey, and that he also said something about his lack of recollection of committing any offense, stating that, after leaving the tavern, "he didn't remember much, or possibly anything"; and that Thorne also made some remark to the effect that "his wife had never misled him yet or something of that kind."

On redirect examination, the witness stated that, during the arraignment:

"My entire effort was to satisfy myself as to what were the probabilities or improbabilities of guilt, and I became satisfied the man knew what was transpiring, that I was justified in accepting his plea of guilty. The only thing that caused me at all at any time to question it was, as I have mentioned, his manner of reply to my inquiry as to whether he was guilty or not guilty. Q. But after he made the reply about his wife, you did make an inquiry, Your Honor, as to whether he was guilty and whether he wanted to withdraw his plea? A. Well, I don't recall I used the words 'withdraw his plea,' but I did after he had made that statement inquire whether he wished to let the plea of guilty stand. THE COURT: Had he been advised at that time, Judge Bell, that the life penalty was involved? A. Yes, sir. THE COURT: He had? A. I had either read the statute or used its exact words as it lay before me, in thus informing."

On recross-examination, the witness testified that Thorne did not indicate that he desired further time within which to plead.

Judge Bell's testimony as to what occurred at Thorne's arraignment was corroborated by seven other witnesses who were present. This testimony indicates that it reasonably appeared to the judge presiding at the time of his arraignment that the prisoner was accorded his constitutional rights. The information was read to him and a copy handed to him. The court informed him of his right to have counsel appointed to represent him at public expense. He declined counsel. He entered a plea of guilty. The judge read to him the applicable statute providing for a mandatory maximum sentence of life imprisonment. The prisoner still insisted that he wanted his plea of guilty to stand. The court imposed the mandatory maximum sentence and the pro-

ceedings were terminated except for the formality of signing the judgment and sentence, which was done a few hours later.

However, Judge Bell was not informed of the events of the preceding day. It clearly appears that the prisoner on Sunday, after being exhorted by his wife (and the deputy prosecutor) to plead guilty to save the family further humiliation, was willing to do so because he had been given the distinct impression by the deputy prosecutor that he would only have to serve a few years, since the board of prison terms and paroles would fix a minimum sentence of comparatively short duration. He evidently also thought that further resistance upon his part was hopeless because his wife claimed to have seen him committing the crime with which he was charged and would testify against him. He doubtless also thought that he would have to answer questions in court if he stood trial.

We are convinced that Thorne would not have waived his right to counsel and pleaded guilty if he had known that he would have to spend the rest of his life in the penitentiary without hope of relief from the board of prison terms and paroles. Nor would he have done so if he had known that neither he nor his wife could have testified at his trial unless he consented thereto. The officers permitted him to cherish this delusion about the jurisdiction of the parole board and concealed from him the serious weakness in their case against him because they wanted him to plead guilty.

Here we have a man thirty-two years of age condemned to penal servitude for the balance of his life (possibly for forty or fifty years) because he was induced by law enforcement officers to believe that he would have to serve only a few years if he pleaded guilty. Under the circumstances in which the prisoner found himself at the time of his arraignment, he might have been willing to save his family embarrassment by pleading guilty and serving a comparatively short term of penal servitude, but it is not reasonable to assume that he would be willing to remain in the penitentiary the rest of his life for the sake of his family.

■ Respondent refers to recent decisions of this court holding that, if a judgment and sentence in a criminal case is not void upon its face, it is not subject to collateral attack in a *habeas corpus* proceeding. *In re Thompson v. Smith*, 33 Wn. (2d) 142, 204 P. (2d) 525; *In re Pennington v. Smith*, 35 Wn. (2d) 267, 212 P. (2d) 811. However, a judgment and sentence entered in a case in which the accused did not understandingly waive counsel is subject to attack by *habeas corpus*. This is the holding of the United States supreme court in *Uveges v. Pennsylvania*, 335 U. S. 437, 93 L. Ed. 127, 69 S. Ct. 184, referred to later in this opinion.

■ This rule is also recognized in our decision in *In re Gensburg v. Smith*, 35 Wn. (2d) 849, 215 P. (2d) 880. Although it was held under the facts found by the trial court in that case that the petitioner had completely and intelligently waived his right to counsel, we stated the rule as follows:

"The due process clause of the fourteenth amendment of the Federal constitution applies to state court proceedings. *Hebert v. Louisiana*, 272 U. S. 312, 71 L. Ed. 270, 47 S. Ct. 103, 48 A. L. R. 1102. That clause does not, as such, incorporate and make applicable to such proceedings, the specific guarantees found in the sixth amendment. *Palko v. Connecticut*, 302 U. S. 319, 82 L. Ed. 288, 58 S. Ct. 149. Nevertheless, a denial by a state of the right to have the assistance of counsel may, in certain circumstances, or in connection with other elements, operate, in a given case, to deprive the accused person of due process of law in violation of the fourteenth amendment. *Betts v. Brady*, 316 U. S. 455, 86 L. Ed. 1595, 62 S. Ct. 1252; *Gibbs v. Burke*, 337 U. S. 773, 780, 93 L. Ed. 1343, 69 S. Ct. 1247. In the latter case the United States supreme court stated the test to be applied, as follows:

" 'Our decisions have been that where the ignorance, youth, or other incapacity of the defendant made a trial without counsel unfair, the defendant is deprived of his liberty contrary to the Fourteenth Amendment. [Footnote: *Uveges v. Pennsylvania*, 335 U. S. 437, 441, and cases there cited.] Counsel necessary for his adequate defense would be lacking.'

"The right of accused persons to appear and defend by counsel is expressly guaranteed by Art. I, § 22, of the state

constitution, as amended by the tenth amendment thereof. In furtherance of this constitutional guarantee, a statutory duty is placed upon the trial court to advise accused persons of their right to counsel, and to appoint such counsel at public expense in proper cases. Rem. Rev. Stat., § 2095 [P.P.C. § 121-37]; Rem. Supp. 1941, § 2305 [P.P.C. § 120-1]. It is not here contended that the trial court failed to perform this duty, nor would the record support such a contention. It is asserted, rather, that appellant was so illiterate and unfamiliar with court proceedings that his purported waiver of the constitutional right to counsel was of no effect.

"An accused person may waive his constitutional right to counsel, but this power of waiver, to be effective, must be exercised 'competently and intelligently.' *Johnson v. Zerbst*, 304 U. S. 458, 82 L. Ed. 1461, 58 S. Ct. 1019, 146 A. L. R. 357; *Voight v. Webb*, 47 F. Supp. 743. In the *Johnson* case it was further held that one who asserts that the right to counsel was not competently and intelligently waived, has the burden of proof to establish that claim."

 We are of the opinion that the facts referred to herein demonstrate that the prisoner was not accorded due process of law as that phrase is understood by the supreme court of the United States.

In *Uveges v. Pennsylvania, supra,* the United States supreme court said:

"Some members of the Court think that where serious offenses are charged, failure of a court to offer counsel in state criminal trials deprives an accused of rights under the Fourteenth Amendment. They are convinced that the services of counsel to protect the accused are guaranteed by the Constitution in every such instance. See *Bute v. Illinois,* 333 U. S. 640, dissent, 677-79. Only when the accused refuses counsel with an understanding of his rights can the court dispense with counsel. Others of us think that when a crime subject to capital punishment is not involved, each case depends on its own facts. See *Betts v. Brady,* 316 U. S. 455, 462. Where the gravity of the crime and other factors—such as the age and education of the defendant, the conduct of the court or the prosecuting officials, and the complicated nature of the offense charged and the possible defenses thereto— render criminal proceedings without counsel so apt to result in injustice as to be fundamentally unfair, the latter group holds that the accused must have legal assistance under the

Amendment whether he pleads guilty or elects to stand trial, whether he requests counsel or not. Only a waiver of counsel, understandingly made, justifies trial without counsel.

"The philosophy behind both of these views is that the due process clause of the Fourteenth Amendment or the Fifth Amendment requires counsel for all persons charged with serious crimes, when necessary for their adequate defense, in order that such persons may be advised how to conduct their trials. The application of the rule varies as indicated in the preceding paragraph."

Tested by the opinion of the first segment of the court, referred to in the quotation from the *Uveges* case, *supra*, appellant was denied due process because he did not understandingly waive counsel.

Tested by the opinion entertained by the other members of the supreme court, due process was not accorded the prisoner because, considering all the facts of this case, particularly the complicated nature of the charge against him, the concealment by the prosecuting officials of his possible defenses thereto, the erroneous advice as to the probable duration of his confinement if he pleaded guilty, the shortness of the interval between his arrest and sentence, and the evident anxiety of the prosecuting officials to obtain a plea of guilty without his consulting an attorney, it was fundamentally unfair for the prisoner to be deprived of counsel, notwithstanding his declining the court's offer of counsel.

This is especially true where, as here, the prisoner's waiver of counsel was made under a mistaken impression, given him by the prosecuting officials, as to the length of the term he would actually have to serve and where, as here, he had no means of apprehending the weakness of the state's case against him, which fact the prosecuting officials concealed from him.

■ It is not intended to intimate that prosecuting officers are under obligation to advise persons accused of crime as to their legal rights, or that they may not discuss such matters with them prior to arraignment. However, if they undertake to give them legal advice, it must be accurate and not misleading as to all matters encompassed therein. If

they either intentionally or unintentionally fail to state such matters correctly, they assume the risk of the possible invalidity of a sentence thereafter imposed where a prisoner who is without counsel may be sentenced to life imprisonment in the penitentiary. As indicated in the quotation from the *Uveges* case, *supra,* the fourteenth amendment requires counsel for all persons charged with serious crimes where the assistance of counsel is necessary to their adequate defense, whether or not they request counsel and whether they plead guilty or stand trial.

In the present case, the trial court made no formal findings of fact. In its oral decision rendered at the close of the testimony, the court several times referred to the failure of the prosecuting officers to correct the erroneous impression which they had given Thorne about the parole board's power to fix a minimum sentence. We quote as follows:

"I have been a little disturbed by the fact, which appears to be the fact, that at no time was he told that life imprisonment meant literally life imprisonment and that the parole board had no power to set a minimum, that there was no minimum period after which the parole board could review it; and I am not entirely sure yet that that is the law, though that would seem to be the implication of the 1947 Statute.

"But, at any rate, he is not a child, and he is not a fool in the sense that he cannot absorb impressions. He knew as early as Sunday that the sentence of the Court at least would be life imprisonment. . . .

"I cannot see that any requirement of due process has been violated here. I think possibly meticulousness might have indicated to the prosecutor that, since he had given the illustration of the automobile theft case in which the man was given fifteen years, but it actually meant only fifteen months because the parole board fixed it,—possibly out of an abundance of caution, and leaning over backwards, the prosecutor might very well have gone back to him when he found out what the life sentence was and told him, 'Well, I want you to know this. If you plead guilty and are sentenced to life in this case, it means life; it doesn't mean anything less.' "

The trial court concluded:

"So I cannot see that there was any unfairness in the proceedings here. True, it happened on a weekend, arrested at

10:00 o'clock Saturday night and sentenced about 10:00 o'clock Monday morning. But if he had any desire at all to escape the consequences of what he had done—and I am convinced he was fully conscious of what he had done—all he had to do was ask to see a lawyer.

"I am satisfied also that he asked to see his wife and child and discovered they were his accusers and were perhaps not friendly to him in the situation, that he would have had no difficulty in getting in touch with other members of his own family, had he requested it."

In regard to the observation of the trial court to the effect that all Thorne needed to do was to ask to see a lawyer, we are convinced that the evidence in this case fully explains why he thought he did not need to do so. The answer is that he thought (from the impression given him by the deputy prosecutor) that whether the maximum sentence was twenty years or life imprisonment the parole board would have power to fix his minimum sentence and that the duration of his confinement would be comparatively short.

We, therefore, conclude that the prisoner did not understandingly waive his right to counsel and under the circumstances shown in the record he was deprived of rights guaranteed by § 22 of Article I of our state constitution, as amended by the tenth amendment, and by the fourteenth amendment of the United States constitution.

The order of the superior court for King county is reversed, with directions that the prisoner be remanded to the custody of the sheriff of Snohomish county to be dealt with by the superior court for that county according to law and in a manner consistent with the views expressed herein.

GRADY, HAMLEY, FINLEY, and WEAVER, JJ., concur.

BEALS, J., dissents.

MALLERY, J. (concurring in the result)—I concur in the result of the opinion for the sole reason that appellant relied upon the legal misinformation volunteered by the deputy prosecuting attorney as to the powers of the parole board.

I think that only to this extent was appellant's waiver of counsel unknowingly made.

I think we should not be concerned with appellant's speculation as to what a jury's verdict might be.

SCHWELLENBACH, C. J., and HILL, J., concur with MALLERY, J.