208 P.3d 1211 (2009)
In re the DETENTION OF Richard Roy SCOTT, Appellant.
No. 61121-6-I.
Court of Appeals of Washington, Division 1.
June 1, 2009.
*1213 David L. Donnan, Washington Appellate Project, Seattle, WA, for Appellant.
David J.W. Hackett, King County Prosecutor's Office, Seattle, WA, for Respondent.

PUBLISHED IN PART
COX, J.
¶ 1 Richard Roy Scott appeals his civil commitment as a sexually violent predator under Washington's sexually violent predator act (SVPA), chapter 71.09 RCW. Dismissal of the State's petition for commitment of Scott as a sexually violent predator (SVP) is not required in response to his claim that he was unlawfully detained beyond the expiration of his revised sentence at the time the State filed the SVP petition against him. First, it is significant that Scott acquiesced to being returned to the custody of the Department of Corrections (DOC) following the hearing for resentencing. Second, unlawful custody, by itself, is not a jurisdictional impediment to a valid petition for commitment under the SVPA.
¶ 2 Because his stipulation to be committed as a sexually violent predator was not involuntary, the trial court did not abuse its discretion in denying Scott's motions for reconsideration of the stipulation and order of commitment as an SVP. This record is insufficient to decide whether the trial court abused its discretion by denying Scott's motion for relief based on the State's alleged violation of his work product privilege. The State was not required to prove a "recent overt act" under the SVP statute. The act underlying Scott's third degree rape of a child conviction was sufficient for purposes of the SVPA. Scott waived two additional issues he now asserts on appeal when he signed the stipulation and order just prior to his scheduled trial. We affirm.
¶ 3 Scott was convicted of five counts of indecent liberties in 1984 in King County. The victims in those counts were between 7 and 13 years of age. He was released from his prison sentence on those charges in 1994.
¶ 4 In 2001, Scott entered an Alford[1] plea to one count of third degree rape of a child. He was initially sentenced to 34 months confinement on July 6, 2001. Due to an apparent scoring error and his successful personal restraint petition, the court resentenced Scott on this charge to a term of 20 months on Friday, May 16, 2003. Because he had already served 24 months, Scott's new sentence made him eligible for release. At the conclusion of the sentencing hearing, the trial court, without objection, ordered Scott returned to the custody of the Department of Corrections to process him for release. On his return to the custody of DOC on Monday morning, May 19, 2003, the department began processing him for release.
¶ 5 On Monday afternoon, May 19, 2003, The King County Prosecuting Attorney's Office, on behalf of the State, filed a petition to commit Scott as an SVP. Scott was never released from custody.
¶ 6 After extensive pre-trial litigation, Scott's SVP trial was scheduled to begin on November 6, 2007. On the morning of trial, Scott voiced his disapproval of his living conditions. He told the court that he was "not in a position to proceed" because he was staying in jail and did not have his clothes or medication. He also was unshaven and had not showered. The trial court ordered the jail to remedy these concerns and ordered the parties to reconvene for further proceedings that afternoon.
¶ 7 When the parties returned, Scott indicated his desire to stipulate to civil commitment if he could reserve three issues for appeal. The parties prepared a stipulation and order of commitment containing three issues reserved for appeal, which Scott signed. The trial court conducted an extensive inquiry on the record to ensure that Scott was entering into the stipulation voluntarily. *1214 The trial court then entered the order.
¶ 8 In the days following entry of the order, Scott filed two motions for relief from the stipulation. He alleged that his agreement had not been voluntary because of the circumstances under which it was signed. The trial court denied these motions.
¶ 9 Scott appeals.

LAWFUL CUSTODY
¶ 10 Scott argues that the trial court erred in denying his motions to dismiss the SVP petition because he was not in lawful custody at the time the petition for commitment was filed and, therefore, the "total confinement" requirement of the SVPA could not be satisfied. We disagree.
¶ 11 Under the SVPA, the State may petition a court to civilly commit an inmate if the individual has previously been convicted of a "sexually violent offense [and] is about to be released from total confinement."[2] To civilly commit the inmate, the State must prove beyond a reasonable doubt that he or she is a sexually violent predator.[3] A sexually violent predator is a person "who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility."[4] To comport with due process, the petition must be based on a current mental illness and present dangerousness.[5]
¶ 12 If the State files the petition when the person has been released from custody and is living in the community, the likelihood that a person will engage in predatory acts "must be evidenced by a recent overt act."[6] "[T]he recent overt act requirement directly and specifically speaks to a person's dangerousness and thus satisfies the dangerousness element required by due process."[7] But if the person is totally confined at the time the petition is filed, no proof of a recent overt act is required.[8]
¶ 13 Scott contends that the "total confinement" requirement of the SVPA must be read to require lawful custody. He contends that the State unlawfully detained him when it returned him to DOC custody after the May 16, 2003 resentencing hearing and thus the SVP court had no jurisdiction when the May 19, 2003 petition was filed. Thus, Scott argues, the trial court should have dismissed the civil commitment petition. We disagree.
¶ 14 First, it is significant that Scott acquiesced to the confinement that he now contests. Scott's arguments focus on the time between his Friday, May 16 resentencing hearing and Monday, May 19, when the State filed the SVP petition while DOC was still processing his release. Because Scott was successful in his personal restraint petition to the supreme court with respect to his confinement on the Pacific County conviction, the trial court held a hearing on Friday, May 16 to give Scott his choice of specific performance (resentencing) or withdrawal of his guilty plea to the charge. Scott chose resentencing. The prosecutor and defense counsel each recommended a sentence of 20 months incarceration, and then discussed the appropriate length of community custody given that Scott had already served 24 months in prison. The record reflects the following colloquy:

*1215 PROSECUTOR: The Department of Corrections will presumably figure all of that out when he gets back to their custody and they will release him as soon as they get all those conditions put on him.

JUDGE: Okay. All right. Mr. Scott you've got the right to make a statement before I do whatever it is I'm going to do.
SCOTT: Um, I agree with everything on the ...
JUDGE: Okay, and ...
SCOTT: sentencing.[[9]]
The judge then entered the agreed 20 month sentence with a community custody range of 36 to 48 months. The sentence included a proviso that Scott was not to serve a total sentence (incarceration plus community custody) greater than 60 months, recognizing that he had already served 24 months. The judge also signed a warrant of commitment, directing the Pacific County sheriff to deliver Scott to the custody of the DOC.[10]
¶ 15 The sheriff's department returned Scott to the Pacific County jail following the hearing. The jail superintendent contacted DOC. A DOC employee told the superintendent that Scott was a sex offender and that victim notifications needed to be taken care of prior to Scott's release. The employee said that the superintendent did not need to transport Scott back to DOC that day, a Friday. The DOC employee said that Scott could be transported in "the normal process on Monday."
¶ 16 On Monday, May 19, the sheriff's department transported Scott from the jail before 8 a.m., arriving at DOC's corrections center in Shelton around 9:45 a.m. Scott was accompanied by a certified copy of his judgment and sentence. DOC employees then began processing Scott's release from total confinement to community custody. This process took the remainder of the day, involving a series of basic procedures that included confirming the judgment with the court clerk, notifying the victim witness unit, notifying law enforcement, checking for other sentencing restrictions, and having Scott comply with sex offender registration requirements, among other things. DOC employees were aware that Scott's records indicated his potential to be committed as a sexually violent predator. At some point during the day, a DOC manager contacted the SVP unit at the King County Prosecutor's Office to inform the prosecutor of Scott's resentencing and pending release. The prosecutor's office received by fax a formal referral letter from the manager, along with a copy of the agreed amended judgment and sentence, at 1:51 p.m.
¶ 17 The petition for commitment and certification of probable cause were filed in the King County Superior Court clerk's office at 3:53 p.m. Shortly thereafter, the King County sheriff's department contacted DOC to arrange to pick up Scott under the resulting warrant. The department executed the warrant and Scott was never released into the community.
¶ 18 Scott contends that the State unlawfully held him past his resentencing hearing on May 16, 2003, where all parties present acknowledged that he had been incarcerated for four months longer than the revised 20 month sentence. He claims that the State, in bad faith, delayed his release in order to facilitate the SVP filing. He argues that he was denied due process because he had a right to be released and that delays in the release process cannot be used to relieve the State of the burden of proving a recent overt act.
¶ 19 Scott's acquiescence to "everything on the ... sentencing," including being returned to the custody of DOC for processing, undercuts these arguments. He was plainly aware that following resentencing he would be returned to the sheriff and ultimately to DOC for processing of his release. When asked by the trial judge to make any statements he chose to make, he failed to raise any objections to his return to DOC custody. We note that he had counsel present during the hearing and still failed to make any objection to being returned to DOC custody. In any event, he made no request for immediate release during or after that hearing. Rather, *1216 he waited until the SVP proceeding to raise the issue. This is too late.
¶ 20 Moreover, two recent reported decisions by other divisions of this court address the issue of whether lawful detention is a prerequisite to a valid SVP petition: In re Det. of Keeney[11] and State v. Dudgeon.[12] Both expressly reject Scott's arguments.
¶ 21 In Keeney, Division Three concluded that "`[l]awful custody' is not a jurisdictional prerequisite to a valid petition for civil commitment as an SVP."[13] The court considered the absence of an explicit requirement of lawful custody in the SVP statute, the "overwhelming weight of persuasive authority" from other jurisdictions, and the legislative intent behind the SVP statute.[14] The court noted both that "there are sufficient procedural protections that mitigate any risk of erroneous deprivation of an inmate's liberty in SVP commitment proceedings" and that "[a]n individual is not precluded from pursuing remedies for an unlawful detention."[15] In sum, the court stated, "the question of the lawfulness of an individual's detention is a separate question, involving separate proceedings, and is not included in the inquiry as to whether an individual meets the criteria for civil commitment as an SVP."[16]
¶ 22 In Dudgeon, Division Two followed the rationale of Keeney, holding that the trial court in an SVP case did not have jurisdiction to determine the lawfulness of the offender's detention for his prior criminal offenses.[17] The court found it "clear" that the SVP court is not the proper venue to challenge the lawfulness of the incarceration.[18] "The SVP court simply determines whether the alleged SVP was incarcerated and whether the incarceration was for a sexually violent offense."[19]
¶ 23 We agree with Keeney and Dudgeon that unlawful custody, by itself, is not a jurisdictional impediment to a valid petition for civil commitment under the SVPA. Nothing suggests that the legislature ever intended commitment proceedings to be a forum for litigating the lawfulness of an alleged predator's prior incarceration. The relevant statutory provisions refer to the actual fact of incarceration and not to the lawfulness of the confinement. Scott claims that since the petition was not filed while he was in lawful custody, the State should be required to prove a recent overt act as if he had been out of custody when the petition was filed. But such a requirement would be an impossible standard for the State to meet because total confinement presumably prevents such acts from occurring.[20] In the absence of a demonstration of bad faith by the authorities or some other rare instance, a trial court should not delve into the legality of an alleged SVP's prior incarceration in the course of an SVP commitment proceeding.
¶ 24 Here, Scott acquiesced to being returned to the custody of DOC following his resentencing hearing. He fails to show any bad faith in this action or in the action of any of the authorities over the next several days leading to the filing of this proceeding on the afternoon of Monday, May 19, 2003. But even if we assumed that Scott's confinement was unlawful on the day the State filed the *1217 SVP petition, Keeney and Dudgeon stand for the proposition that the trial court correctly denied his multiple motions to dismiss on this ground. Under Dudgeon, the trial court did not have authority to determine the lawfulness of Scott's prior detention.[21]
¶ 25 Scott urges this court to reject the underlying premise of Dudgeon. He argues that since the SVP court must already determine whether an individual was "incarcerated" when a petition was filed, determining the propriety of the incarceration is "merely another of the preliminary contingencies" upon which the trial court should rule. This argument is unpersuasive in light of the reasoning and results of Keeney and Dudgeon. The question of the lawfulness of an individual's incarceration is a separate question, involving separate proceedings.[22]
¶ 26 Scott also argues that due process requires the State to prove beyond a reasonable doubt that he committed a recent overt act after the completion of his sentence in order to commit him under RCW 71.09.[23] This is not what the case law requires. Instead, "due process requires that the State prove a recent overt act at trial unless the individual is incarcerated for a sexually violent offense or a recent overt act at the time the sexual predator petition is filed."[24] The State does not have a burden to prove a recent overt act "before the offender is released from total confinement."[25]
¶ 27 Here, even if Scott was "past his max date" for confinement for his crime in Pacific County, the record shows he had not yet been released into the community at the time the State filed an SVP petition against him. Therefore, since there is no dispute that Scott was incarcerated "for an act that would itself qualify as a recent overt act," RCW 71.09.020(10), then the State was not required to plead and prove a recent overt act had a trial taken place.[26]

STIPULATION AND ORDER OF COMMITMENT
¶ 28 Scott argues that the trial court abused its discretion in failing to allow him to withdraw his stipulation because the stipulation was entered in "oppressive circumstances." We disagree.
¶ 29 Washington courts recognize that civil commitment is a significant deprivation of liberty.[27] Therefore, individuals facing commitment, especially those facing SVP commitment, are entitled to due process of law before they can be committed.[28] "[A]lthough SVP commitment proceedings include many of the same protections as a criminal trial, SVP commitment proceedings are not criminal proceedings."[29] The civil case law for withdrawing a stipulation to civil commitment due to claims for duress is not well established. Here, the State proposes and we agree that it is appropriate to use criminal case law to provide guidance in resolving this question.
¶ 30 In a criminal case, due process requires that a defendant's guilty plea be knowing, intelligent, and voluntary.[30] *1218 Whether a plea is knowingly, intelligently, and voluntarily made is determined from a totality of the circumstances.[31] There is a strong public interest in the enforcement of plea agreements when they are voluntarily and intelligently made.[32] The court may allow a defendant to withdraw his guilty plea "whenever it appears that the withdrawal is necessary to correct a manifest injustice."[33] The defendant bears the burden of proving manifest injustice, defined as "obvious, directly observable, overt, not obscure."[34] An involuntary plea may amount to manifest injustice.[35]
¶ 31 A defendant's signature on a plea statement is strong evidence of a plea's voluntariness.[36] A judge's on-record inquiry of a defendant who signs a plea agreement strengthens the inference of voluntariness:
When a defendant fills out a written statement on plea of guilty in compliance with CrR 4.2(g) and acknowledges that he or she has read it and understands it and that its contents are true, the written statement provides prima facie verification of the plea's voluntariness. When the judge goes on to inquire orally of the defendant and satisfies himself on the record of the existence of the various criteria of voluntariness, the presumption of voluntariness is well nigh irrefutable.[[37]]
The defendant must present some evidence of involuntariness beyond his self-serving allegations.[38]
¶ 32 Here, the record contains both Scott's signed Stipulation and Order of Commitment and a record of the colloquy at the time Scott signed the stipulation. The stipulation fully sets forth the procedural rights that Scott waived by signing the agreement. The document shows Scott's signature acknowledging that he understood by entering into the stipulation he was knowingly, voluntarily, and intelligently waiving those rights.
¶ 33 Moreover, the State questioned him about the contents of the document. In response to the State's questions at the hearing, Scott stated that he: (1) had a copy of the document in front of him; (2) had read it and had a chance to address any questions regarding it with his standby attorney, who was present during the hearing; (3) understood that he was giving up the rights listed in the stipulation; (4) had not been threatened, coerced, or received any promises causing him to enter into the stipulation; (5) agreed that he was a sexually violent predator as defined in RCW 71.09.020 and that he should be committed pursuant to the statute. We also note that the stipulation contains handwritten pages representing Scott's amendments to the proposed typed stipulation the State presented.
¶ 34 The court then further inquired into the voluntariness of Scott's decision to enter into the stipulation. Scott agreed that he made the decision to enter into the stipulation "freely and voluntarily." Then the court asked:
THE COURT: That nobody has brought pressure on you or somebody you care about so that you would change your position on your right to have a trial in this matter?
[SCOTT]: As I've expressed already to this Court today, I don't see that as a pro se housed in the jail, that I could win. So it's a case of I don't feel I could win as a pro se housed in the jail.[[39]]
*1219 After additional discussion with the State about the terms of the reserved issues in the stipulation, the court again inquired:
THE COURT: Now, again, do you have any additional questions that you want to ask [your standby counsel]? Do you have any need to think about this further? Would you like to look at the original and then you can ask a question?
[SCOTT]: I'm ready and fine, thanks. We do have the transport order ready to be signed.
THE COURT: And, of course, I would sign that, regardless, whether you 
[SCOTT]: Right.
THE COURT: But again, Mr. Scott, I know you're kind of in a rush to wrap this up, but is there anything that we haven't talked about in court or in this document that you want to bring to my attention?
[SCOTT]: I'd just like to express my appreciation to the Court.
THE COURT: Okay. Well, that is kind.... But again, today, the choice is yours, Mr. Scott. There's no question that you have a right to trial and we were all prepared to go to trial today. Is there any hesitation that you have about moving forward based on these documents, whereby there will be entered a stipulation reserving a few issues, perhaps very important issues, perhaps dispositive issues, but again, relatively few issues compared to all of the things that would have happened at trial. That is your wish today?
[SCOTT]: Yes.
THE COURT: That's what you are indicating to the Court by your signature?
[SCOTT]: That is my wish and I agree with Your Honor that very likely these three issues might be dispositive of this case anyway. So by moving forward with those three issues now, it might speed up my release.
[THE STATE]: And, Your Honor, if I could clarify one other thing on the record. Mr. Scott, you understand that as happened this morning, that the Court is here to assist you with obtaining whatever you may need from the jail to proceed pro se if this trial were to go forward?
[SCOTT]: No, I would not be able to. I do not feel that I could proceed pro se in the King County Jail under any circumstances.
[THE STATE]: What I'm saying is you understand that the Court is here to make sure that you have materials available to you at the jail? For instance, this morning the Court helped you obtain materials that you brought to court this afternoon. You understand the Court is here to do that role. Knowing that the Court does that role, do you still wish to go forward with the stipulation?
[SCOTT]: I'm not aware of any materials that were brought here to the Court today on my behalf.[[40]]
The State then asked the court to further explore this issue, not wanting the record to reflect that Scott was entering into the stipulation because he felt he was being denied pro se materials at the jail.[41] The court again addressed Scott:
THE COURT: The important thing, I don't want there to be something that is left unsaid. If you believe that you are entering into this stipulation because some other situation forced you to do so, then you need to tell me that. As I say, if you're making this choice freely and voluntarily, that was one of the questions I asked you. It's not a happy day, necessarily, for any of us, including you. But you are the one who is forced with making a choice today.
If there is something that is not voluntary about this, this would be the time to let me know. If you believe that it's better to have a trial, then that's the choice you should make. If you believe it is not better to have a trial, and again, believe me, I will do everything I can to make it a fair trial, then you can discuss that with me. But only you can decide that.
I wouldn't pretend to give you advice. I know you have had [standby counsel] available to give you advice. I don't know *1220 whether this agrees with what he recommends or doesn't, but today, you are the person who makes this decision.
[SCOTT]: The Court seems hesitant to accept the stipulation.
THE COURT: Oh, no.
[SCOTT]: As I said before, I do not  this is just like someone who would enter a guilty plea because they feel a jury would convict them. I'm entering this plea because I feel, as a pro se, I cannot proceed from a county jail. Of which I have no choice but to proceed from a county jail.
It's pretty simple. So I'm entering this stipulation on the ground I don't feel I would win as a pro se operating from a county jail. I think that's enough. I've repeated it a couple of times.[[42]]
After the court reminded Scott that the issue of whether he was somehow disadvantaged by having to operate from the county jail was not reserved for review in the terms of the stipulation, it again told Scott that it was important that his choice was voluntary.[43] The following exchange then occurred:
[THE STATE]: The State understands, Your Honor, Mr. Scott to be saying he's making this choice after weighing the strategic benefits of proceeding versus the strategic benefits of entering into a stipulation. And I believe the Court has made it clear to Mr. Scott that the Court would make sure that resources were available to him.
THE COURT: That is true.
[SCOTT]: I think Mr. Hackett has said it better than I could.
THE COURT: Okay.[[44]]
¶ 35 This record shows Scott fails in overcoming the presumption of voluntariness of the written stipulation. In other words, this case falls within the language of the case law that the presumption is "well nigh irrefutable."[45]
¶ 36 The day after the hearing, Scott moved to reconsider under CRs 59 and 60, claiming that the "stipulation was gotten under duress." Scott claimed that "he was so anxious to get his medication and to be moved out of King County Jail and in so much pain as well as fear that he felt he had to sign the stipulation to get his meds & Release."[46] Scott himself did not file a sworn statement to support these claims.
¶ 37 Scott's standby counsel, Michael Kahrs, filed a declaration in support of the motion. As to the circumstances under which Scott signed and entered the stipulation, the declaration reflects that Scott was permitted to "take a shower and put on his court clothes" before the afternoon of trial. The declaration also shows that Scott "received his medications at counsel table after meeting with the State in the jury room and agreeing to the stipulation for commitment." The court denied this motion.
¶ 38 Scott filed a second motion seeking relief from the stipulation. The motion and his attached declaration outline much of the same concerns (lack of shower, proper clothing, and medication) as well as provide greater detail about the conditions of his stay at the jail the night before trial. Scott's declaration states that he got no sleep and felt as if he "might go nuts" while in jail before trial. He "considered the hopelessness of the above [circumstances]" when he returned to court the afternoon of trial. The declaration says that "[a] headache was setting in" and Scott feared a "migraine without meds," another day and night in the jail, a nervous breakdown, and a seizure. According to the declaration, Scott "was ready to agree to whatever [it] took."
¶ 39 Kahrs filed a second declaration with this motion for relief. Kahrs notes that Scott was "agitated" on the afternoon of trial. Scott was apparently prepared to sign the order of stipulation immediately, without further examination of the document, because *1221 his focus was on his medications and getting back to the Special Commitment Center. The declaration states that Kahrs was "extremely concerned that the stipulation was not voluntary and that Mr. Scott was in a panic mode because he continually stated that he had no choice."[47]
¶ 40 To the extent the alleged facts in the motions for relief and the supporting declarations raise new information that contradicts what was said during the trial court's hearing, Scott still fails to overcome the presumption that his decision to stipulate to commitment was voluntary. Scott bears the burden of proving manifest injustice, defined as "obvious, directly observable, overt, not obscure."[48] He has not met that burden here.
¶ 41 The primary conditions he complains of are those that were remedied prior to the court's entering his stipulation: his lack of a shower, proper clothing, and his medication. At no time on the afternoon of the scheduled trial did Scott mention that he was suffering from pain. In fact, Scott agreed on the record that he felt well enough to enter into the stipulation. The State asked Scott to clarify whether he felt well enough to enter into a stipulation at that point, to which Scott responded, "Sure, yes, your honor."
¶ 42 Nothing obvious or directly observable in the record is consistent with Scott's contention that his stipulation was involuntary. The allegations in his motions for relief appear to be self-serving and unsupported by the evidence.[49] The trial court did not abuse its discretion in denying both of Scott's motions for reconsideration.
¶ 43 Scott argues that the trial court should not have accepted the stipulation because his statements included "equivocations." When a criminal defendant attempts to make a plea, which "by its very wording couples a protestation of innocence with an assertion of guilt," a trial court should refuse to accept the plea until the equivocation has been eliminated.[50] Scott's statements did not include such a protest. He agreed that he was trying to say that he had weighed "the strategic benefits of proceeding versus the strategic benefits of entering into a stipulation."
¶ 44 We affirm all orders on appeal.
¶ 45 The balance of this opinion has no precedential value. Accordingly, pursuant to RCW 2.06.040, it shall not be published.
WE CONCUR: AGID and GROSSE, JJ.
NOTES
[1] North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).
[2] RCW 71.09.030(1).
[3] RCW 71.09.060(1).
[4] RCW 71.09.020(16).
[5] In re Det. of Albrecht, 147 Wash.2d 1, 7-8, 51 P.3d 73 (2002), review denied, 157 Wash.2d 1003, 136 P.3d 758(2006).
[6] RCW 71.09.020(7); RCW 71.09.060(1); In re Pers. Restraint of Young, 122 Wash.2d 1, 41-42, 857 P.2d 989 (1993); see also RCW 71.09.020(10) ("`Recent overt act' means any act or threat that has either caused harm of a sexually violent nature or creates a reasonable apprehension of such harm in the mind of an objective person who knows of the history and mental condition of the person engaging in the act.").
[7] Albrecht, 147 Wash.2d at 11, 51 P.3d 73.
[8] RCW 71.09.060; In re Det. of Henrickson, 140 Wash.2d 686, 697, 2 P.3d 473 (2000).
[9] Clerk's Papers at 660 (emphasis added).
[10] Clerk's Papers at 663-64.
[11] 141 Wash.App. 318, 169 P.3d 852 (2007).
[12] 146 Wash.App. 216, 189 P.3d 240 (2008), review denied, 165 Wash.2d 1028, 203 P.3d 378 (2009).
[13] Keeney, 141 Wash.App. at 331, 169 P.3d 852.
[14] Id. at 329-30, 169 P.3d 852 (citing People v. Hubbart, 88 Cal.App.4th 1202, 1228-29, 106 Cal. Rptr.2d 490 (2001); People ex rel. Smith v. Jackson, 37 Ill.2d 379, 383-84, 227 N.E.2d 366 (1967); In re Kenney, 66 Mass.App.Ct. 709, 713-14, 850 N.E.2d 590, review denied, 447 Mass. 1110, 854 N.E.2d 441 (2006)).
[15] Id. at 330-31, 169 P.3d 852.
[16] Id. at 331, 169 P.3d 852.
[17] Dudgeon, 146 Wash.App. at 223, 189 P.3d 240.
[18] Id. at 224, 189 P.3d 240.
[19] Id.
[20] See Dudgeon, 146 Wash.App. at 225, 189 P.3d 240 (citing Albrecht, 147 Wash.2d at 9, 51 P.3d 73); see also Henrickson, 140 Wash.2d at 695, 2 P.3d 473 (quoting In re Young, 122 Wash.2d at 41, 857 P.2d 989) ("`For incarcerated individuals, a requirement of a recent overt act under the Statute would create a standard which would be impossible to meet.'").
[21] Dudgeon, 146 Wash.App. at 223, 189 P.3d 240.
[22] Keeney, 141 Wash.App. at 331, 169 P.3d 852.
[23] Appellant's Amended Opening Brief at 30 (emphasis added).
[24] In re Det. of Davis, 109 Wash.App. 734, 736, 37 P.3d 325 (2002) (citing Henrickson, 140 Wash.2d 686, 2 P.3d 473) (emphasis added).
[25] Albrecht, 147 Wash.2d at 10, 51 P.3d 73 (emphasis added); see also RCW 71.09.030(5) (Prosecutor may file SVP petition if it appears that the person may be an SVP and the person has at any time previously has been convicted of a sexually violent offense "and has since been released from total confinement and has committed a recent overt act.") (emphasis added).
[26] See Dudgeon, 146 Wash.App. at 224, 189 P.3d 240.
[27] In re Det. of Stout, 159 Wash.2d 357, 369, 150 P.3d 86 (2007) (citing Addington v. Texas, 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)).
[28] Id.
[29] Id. (citing Seling v. Young, 531 U.S. 250, 260, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001)); In re Young, 122 Wash.2d at 23, 857 P.2d 989.
[30] State v. Codiga, 162 Wash.2d 912, 922, 175 P.3d 1082 (2008).
[31] State v. Branch, 129 Wash.2d 635, 642, 919 P.2d 1228 (1996).
[32] Codiga, 162 Wash.2d at 922, 175 P.3d 1082 (citing State v. Walsh, 143 Wash.2d 1, 6, 17 P.3d 591 (2001)).
[33] CrR 4.2(f); Walsh, 143 Wash.2d at 6, 17 P.3d 591.
[34] State v. Ross, 129 Wash.2d 279, 283-84, 916 P.2d 405 (1996).
[35] Codiga, 162 Wash.2d at 923, 175 P.3d 1082 (citing State v. Mendoza, 157 Wash.2d 582, 587, 141 P.3d 49 (2006)).
[36] Branch, 129 Wash.2d at 642, 919 P.2d 1228.
[37] Id. at 642 n. 2, 919 P.2d 1228.
[38] State v. Osborne, 102 Wash.2d 87, 97, 684 P.2d 683 (1984).
[39] Report of Proceedings (November 6, 2007) at 41.
[40] Id. at 59-61.
[41] Id. at 62.
[42] Id. at 64-65.
[43] Id. at 65-66.
[44] Id. at 66.
[45] See Branch, 129 Wash.2d at 642 n. 2, 919 P.2d 1228 (presumption is "well nigh irrefutable" where there is satisfactory written and oral acknowledgment of plea).
[46] Clerk's Papers at 548.
[47] Clerk's Papers at 577.
[48] See Ross, 129 Wash.2d at 283-84, 916 P.2d 405.
[49] See Osborne, 102 Wash.2d at 97, 684 P.2d 683 (defendant must present some evidence of involuntariness beyond self-serving allegations).
[50] State v. Stacy, 43 Wash.2d 358, 363, 261 P.2d 400 (1953).